UNITED STATES of America
and
E. I. du Pont de Nemours and Company,
Plaintiffs,

v.

Otis W. LIVINGSTON, James W. Crain,
James H. Sullivan, J. A. Calhoun, Jr.,
and Francis M. Pinckney, individually
and as constituting the South Carolina
Tax Commission, Defendants.

Civ. A. No. AC–174.

United States District Court
E. D. South Carolina,
Columbia Division.

Nov. 18, 1959.

N. Welch Morrisette, U. S. Atty., Columbia, S. C., Charles K. Rice, Asst. Atty. Gen., H. Eugene Heine, Jr., and Lloyd J. Keno, Dept. of Justice, Washington, D. C., for plaintiff United States.

Roberts, Jennings, Thomas & Lumpkin, Columbia, S. C., Hugh K. Clark and Daniel F. Marple, II, Wilmington, Del., of counsel, for plaintiffs E. I. du Pont de Nemours & Co.

L. K. Olson and Herzel H. E. Plaine, Washington, D. C., and Allen M. Coker, Aiken, S. C., of counsel for Atomic Energy Commission.

T. C. Callison, Atty. Gen. of South Carolina, James S. Verner and James M. Windham, Asst. Attys. Gen., for defendant South Carolina Tax Commission.

Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and TIMMERMAN, District Judge.

HAYNSWORTH, Circuit Judge.

In this action by the United States and E. I. du Pont de Nemours and Company against the members of the South Carolina Tax Commission, the plaintiffs seek an injunction against the collection of South Carolina sales and use taxes upon the use of purchased materials at the Savannah River Project, a facility of the United States, producing, under the direction of du Pont and the supervision of the Atomic Energy Commission, nuclear and related materials.

I.

A preliminary question arises under a motion to dismiss in which the defendants assert that maintenance of the action is prohibited by statute [1] and that, in any event, this court should stay its hand until the legal questions have been settled in the state courts.

It is not contended, however, that the United States is only a nominal plaintiff. From what will later appear, it is the real party in interest. The issue it tenders is not one of interpretation or general application of state laws, but of its own constitutional immunity from state taxation. Such an action in no way involves the evils at which the Act of August 21, 1937 was directed.[2] It is apparent the Congress was concerned with the disparity between the rights of a citizen of a state, whose only means of litigating his disputed state tax liabilities was a suit for refund of prepaid taxes, and those of foreign corporations and nonresidents, doing business within the state and incurring tax obligations, who could obtain in the federal courts equitable relief denied to citizens of the state. No reference was made in the committee reports to actions by the United States seeking protection and recognition of its sovereignty. The administrative and judicial procedures for the adjustment and adjudication of private tax obligations to a state may be quite inappropriate to the resolution of questions of sovereignty and of sovereign immunity; at least, the two kinds of questions hardly may be said to be so comparable that procedural restrictions applicable to adjudication of the one should be held, by implication, to be applicable to the other.

There appears no good reason why the Congress should deny the United States the protection of the equitable powers of her own courts in a situation such as that with which we are now concerned, and it has been generally and broadly

---

1. 28 U.S.C.A. § 1341. "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."

2. See S.Rep. No. 1035, H.Rep. No. 1503, 75th Congress, 1st Session.

held that it did not do so when it enacted, as an amendment to § 24 of the Judicial Code (former § 41 of Title 28 U.S.C.A.), what is now § 1341 of Title 28 U.S.C.A. United States v. Woodworth, 2 Cir., 170 F.2d 1019; Board of Commissioners of Pawnee County, Okl. v. United States, 10 Cir., 139 F.2d 248; City of Springfield v. United States, 1 Cir., 99 F.2d 860; United States v. Okaloosa County, D.C. N.D.Fla., 59 F.Supp. 426.

■ The old notion that the sovereign is not bound by its legislative restrictions upon the exercise of remedial rights unless the legislative intention that it be so is expressly and clearly stated[3] is greatly reinforced when application of the restriction to the particular action is far from the purpose and general intention of the Congress as disclosed in the reports of its committees. It is further strengthened by the fact that Congress made no provision for the use of the public moneys of the United States for the prepayment of contested state taxes, without which a suit for refund, the usual legal remedy provided by the states, is unavailable. Indeed, it has been held that a state remedy is not "plain, speedy and efficient," as to the United States, if its availability is conditioned upon a prepayment of the tax.[4] Board of Commissioners of Pawnee County, Okl. v. United States, 10 Cir., 139 F.2d 248; City of Springfield v. United States, 1 Cir., 99 F.2d 860.

We conclude that 28 U.S.C.A. § 1341 does not deprive this court of jurisdiction of this action by the United States, by which it seeks protection of its sovereign immunity from taxation.

Were the United States seeking to avail itself of an exemption or privilege granted by the state, we might, nevertheless, feel constrained to withhold action until the state courts decided the limits of the state's exclusory grants. United States v. City of New York, 2 Cir., 175 F.2d 75. Here the sole question is whether or not the United States is the real purchaser and user of the purchased articles so as to make their purchase and use immune from state taxation. That question arises under the Constitution of the United States and its answer is not dependent upon the resolution of any question of state law. It is our duty to consider the federal question, and there is no basis for a remission of the plaintiffs to the state courts.

■ The doctrine of abstention does not provide an escape from the duty of decision here. If South Carolina's sales and use tax statutes were subject to an interpretation which, if adopted by the Supreme Court of that State, would avoid the federal constitutional question, or even narrow or circumscribe that federal question, we well might stay our hand. Regard for the interest and sovereignty of the state and reluctance needlessly to adjudicate constitutional issues may require a federal District Court to abstain from adjudication if the parties may avail themselves of an appropriate procedure to obtain state interpretation of state laws requiring construction. Harrison v. N. A. A. C. P., 360 U.S. 167, 79 S.Ct. 1025, 3 L.Ed.2d 1152. The decision in Harrison, however, is not a broad encyclical commanding automatic remission to the state courts of all federal constitutional questions arising in the application of state statutes. N. A. A. C. P. v. Bennett, 360 U.S. 471, 79 S.Ct. 1192, 3 L.Ed.2d 1375. Though never

---

3. Dollar Savings Bank v. United States, 19 Wall. 227, 86 U.S. 227, 22 L.Ed. 80.

4. The exclusive remedy, under the laws of South Carolina, is a suit for refund after prepayment, in full, of the tax. The South Carolina Tax Commission, agreeing conditionally to waive its claim of interest and extending certain other considerations in the light of the problems of plaintiffs' officials, refused to waive the procedural requirement of prepayment in full of the tax claimed to be due. The amount of this tax, as of March 31, 1958, exceeded $1,750,000. It is not shown that the Atomic Energy Commission had available funds in that amount which it might use for that purpose without impairment of its essential functions, or, indeed, that the Commission had authority to use any appropriated funds for such a purpose.

interpreted by a state court, if a state statute is not fairly subject to an interpretation which will avoid or modify the federal constitutional question, it is the duty of a federal court to decide the federal question when presented to it. Any other course would impose expense and long delay upon the litigants without hope of its bearing fruit.

We have here no question of construction of the state statute. The use tax is laid broadly by § 65–1421 upon the "use or other consumption * * * of tangible personal property." The defendants are seeking to collect the tax in obedience to the direction of § 65–1361.1 [5] which imposes the tax even though the purchaser and user be acting as agent of the United States or its instrumentalities.

■ There is in the statute a general exemption [6] if imposition of the tax is prohibited by the state or federal constitutions. Legislatures, however, should not be presumed to lightly disregard constitutional limitations. General recognition of constitutional restraint is implicit in statutes which do not express it. Expression of that general recognition does not make ambiguous the statute's explicit command.

We find here no question of the construction of the state statutes. Indeed, the defendants do not suggest that any such question exists. They ask that we remit the parties to the state courts for an adjudication of the federal constitutional question. As we would defer to the state courts in cases involving questions of state law, we must perform our duty of decision in a case in which the only question is federal.

There is another reason that the restrictions of 28 U.S.C.A. § 1341 should be held inapplicable to this case and that the plaintiffs should not be remitted to the state courts. That the state court when ordering a refund of sales and use taxes would include in its judgment interest upon the overpayment, or otherwise compel the allowance and payment of such interest is, at least, doubtful.

In Paris Mountain Water Co. v. Woodside, 133 S.C. 383, 131 S.E. 37, the Supreme Court of South Carolina held that interest was allowable upon a refund of an overpayment of taxes and ordered its payment. A three judge federal court later examined the record and the briefs in Paris Mountain Water Co., found that the question had been fully submitted and adjudicated and concluded that the question was settled. Southern R. Co. v. Query, D.C.E.D.S.C., 21 F.2d 333.[7] In February 1929, however, the Supreme Court of South Carolina held in Monarch Mills v. South Carolina Tax Commission, 149 S.C. 219, 146 S.E. 870, that a taxpayer could not recover interest upon refunded income taxes in the absence of specific statutory authorization.

The South Carolina Legislature reacted to the decision in Monarch Mills by promptly passing an act [8] providing for the payment of such interest. It did not

5. § 65–1361.1. "Same; purchases at retail for storage, etc. Notwithstanding any other provision of law, sales of any tangible personal property to contractors purchasing such property for use in the performance of contracts and sales of any tangible personal property to contractors purchasing such property either (a) as agents of the United States or its instrumentalities, or (b) for their own account for use in the performance of contracts with the United States or its instrumentalities, are retail sales subject to the tax levied against the vendor as provided by this chapter and are purchases at retail for storage, use or other consumption in this State subject to the tax as provided by this chapter."

6. Code of Laws of South Carolina, 1952, § 65–1404(1), § 65–1422(2).

7. The Court in Paris Mountain Water Co. was concerned with a refund of ad valorem taxes; in Southern R. Co., with income taxes. Suits for refund of the two taxes were authorized in the same statutory language, so the decision in Paris Mountain Water Co. controlled the result in Southern R. Co. See § 65–2662 of the South Carolina Code of 1952.

8. Act of March 16, 1929, 36 Stat. 1048, now § 65–330 of the South Carolina Code of 1952.

enlarge, however, the state's waiver of her immunity or her consent to be sued. Section 65–2662 of the South Carolina Code of 1952 permits actions against the state to recover taxes and penalties illegally collected. It does not expressly authorize actions for the recovery of accruing interest.

 A state's waiver of her immunity from suit need not be as broad as the administrative duty imposed by her statutes upon her officials and agencies. South Carolina's consent to actions for the refund of taxes is strictly construed.[9] In Argent Lumber Co. v. Query, 178 S.C. 1, 182 S.E. 93, the Supreme Court of South Carolina recognized that the consent to be sued was more restrictive than the broad administrative duty to refund taxes illegally collected which other statutes imposed upon the Tax Commission.

Shortly before the filing of this action, the Supreme Court of South Carolina refused to allow interest upon a refund of certain license taxes. Colonial Life & Accident Insurance Co. v. South Carolina Tax Commission, 233 S.C. 129, 103 S.E.2d 908. The statute imposing those license taxes adopted the income tax statute authorizing the payment of interest upon refunds and the separate statute permitting actions for the refund of taxes and penalties.[10] Without explanation, and citing only its 1929 decision in the Monarch Mills case, the Supreme Court of South Carolina simply said there was no statute permitting the recovery of interest upon the refund of these license taxes. The question of interest was a very subordinate one in that case. The statute requiring the Tax Commission to pay interest upon refunds was not mentioned in the decree of the lower court nor in the briefs in the Supreme Court. The opinion contains no reference to that statute. Possibly, the statute was overlooked, and there may be other explanation of the holding in that case. Until the Supreme Court of South Carolina again speaks upon the subject, however, its holding is open to the possible interpretation that there has been no waiver of the State's immunity from suit to recover accruing interest upon refundable taxes.

Prior to the decision in the Colonial Life case, the Tax Commission had taken the position that interest was not recoverable in an action for refund of taxes. In a letter dated April 22, 1958, written by its General Counsel, the Tax Commission informed the Atomic Energy Commission that interest could not be collected in an action for refund of the very sales and use taxes now in issue.[11] In that letter the Tax Commission stated, "The statute makes no provision for payment of interest where the required taxes are paid under protest and the taxpayer prevails in a suit to recover payment of such taxes." The Tax Commission and its General Counsel certainly knew of § 65–1459 and no explanation of its position comes readily to mind, except that suggested in the language used in Argent Lumber Co. The actual question decided in Argent Lumber Co. is dissimilar to the one with which we are concerned, but it suggests a strict interpretation of the waiver of immunity without regard to a broader administrative duty which other statutes impose upon the Tax Commission.

Notwithstanding the fact that its earlier position has now acquired the

9. Bomar v. City of Spartanburg, 181 S.C. 453, 187 S.E. 921.

10. Art. 1, § 96(d), of the Act of April 19, 1951, 47 Stat. 656, codified in somewhat different language as § 65–934 of the South Carolina Code of 1952.

11. The South Carolina Sales and Use Tax Act contains provisions entirely comparable to those applicable to income taxes.

§ 65–1459 provides for the payment of interest while § 65–1467 permits, as the taxpayer's exclusive remedy, an action for refund of tax, penalty or interest paid, if filed within thirty days after the date of payment under protest. As in the comparable income tax provisions, the allowance of interest upon refunds is not mentioned in the sections relating directly to actions in the courts.

support of the holding in the Colonial Life case, the Tax Commission now argues earnestly and persuasively that the statutes do permit recovery of interest in actions for refund of taxes. When, in 1929, the Legislature made provision for the payment of interest upon refunds of income taxes paid, it is said it was motivated, in part, by the decision of the three judge court in Southern Railway Co. v. Query, from which it knew that interest payable only by the grace of the Tax Commission would leave South Carolina's legal remedy plainly inadequate and make available to taxpayers equitable remedies. Finally, they say that if the court is powerless to order the payment of interest as a part of its determination of a refundable overpayment, it may do so by a writ of mandamus should the Tax Commission, thereafter, refuse or neglect to pay the interest. Cf. Argent Lumber Co. v. Query, supra.

The Tax Commission says that hard work and thorough reconsideration in the office of the Attorney General has led to the change in its official position. We find much force in their present position, were it an open question, but the right to recover interest can hardly be said to have been obvious at the time of filing of this action when (1) the Tax Commission and its General Counsel officially denied existence of the right (2) the decisions of the South Carolina Supreme Court cast grave doubt upon the existence of the right, and (3) the Legislature's failure to specifically mention interest in its consent to be sued opened the statutes to the interpretation the South Carolina Supreme Court may have adopted, that the waiver of immunity is substantively narrower than the statutory right to administrative relief.

It is well settled that a right to recover taxes illegally collected is not an adequate remedy if it does not include the right to recover interest at a reasonable rate for the period during which the taxpayer's money is withheld.[12] Even if existence of the right be merely cast in substantial doubt, the remedy is not plain or adequate.[13] The official position of the Tax Commission at the time of filing of this action and the decision of the Supreme Court of South Carolina in Colonial Life requires us to conclude there is presently grave doubt of the existence of a right to recover interest in such cases and that the legal remedy afforded taxpayers in South Carolina is not plain or adequate.

In the face of such official denials, a taxpayer should not be required to run the risk that the official position might be sustained. If the right to recover interest upon the refund was not obvious to the South Carolina Tax Commission and its General Counsel, this Court can hardly say it must have been obvious to the taxpayer.

South Carolina may allow interest upon refunds of taxes or not as she chooses. If she does not make clear the existence of the right to recover such interest, however, she necessarily opens the door to equitable relief to taxpayers and forecloses a remission of the parties to the legal remedy provided by her statutes.

The defendants' motion to dismiss will be denied.

## II.

The defendants also contend this is not a case for a three judge court, a contention which is foreclosed by Query v. United States, 316 U.S. 486, 62 S.Ct. 1122, 86 L.Ed. 1616, without regard to

---

12. Nutt v. Ellerbe, D.C.E.D.S.C., 56 F.2d 1058; Southern R. Co. v. Query, D.C. E.D.S.C., 21 F.2d 333; Mullaney v. Hess, 9 Cir., 189 F.2d 417; Southern California Telephone Co. v. Hopkins, 9 Cir., 13 F.2d 814; Hopkins v. Southern California Telephone Co., 275 U.S. 393, 48 S.Ct. 180, 72 L.Ed. 329; Proctor & Gamble Distributing Co. v. Sherman, D.C. S.D.N.Y., 2 F.2d 165.

13. Spector Motor Service, Inc. v. O'Connor, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573; Township of Hillsborough, Somerset County, N. J. v. Cromwell, 326 U.S. 620, 66 S.Ct. 445, 90 L.Ed. 358; Spector Motor Service, Inc. v. McLaughlin, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101; Nutt v. Ellerbe, D.C.E.D.S.C., 56 F.2d 1058; Southern R. Co. v. Query, D.C.E.D. S.C., 21 F.2d 333.

the fact that § 65–1361.1 of the South Carolina Code of 1952, if it may be constitutionally applied, warrants the position taken by the defendants and authorizes their conduct.

We come to the merits.

### III.

The contract between the United States, represented by the Atomic Energy Commission, and du Pont, pursuant to which the Savannah River Plant was designed, constructed and operated, was an extraordinary one. For its better understanding, brief reference to its historical setting is appropriate.

In the early days of the Manhattan District Project, du Pont was called upon to lend its services in the design, construction and operation of the Hanford Engineer Works in the State of Washington. It undertook to do this for a fee of one dollar, and entered upon the work in October 1942. Under du Pont's management, the Hanford Engineer Works was constructed and made its contribution to the production of the first atomic weapons. After the cessation of hostilities, however, du Pont withdrew from the Hanford contract, and, on September 1, 1946, was replaced by the General Electric Company as the manager of those works. See E. I. Du Pont de Nemours & Co. v. State, 44 Wash.2d 339, 267 P.2d 667.

The explosion of the Hiroshima and Nagasaki weapons and their demonstration of destructive power, which, until then, was wholly unprecedented, led the Congress to give careful consideration to the needs and responsibilities of the nation for the use, control and development of this new source of energy. The great size of the Manhattan District Project and the apparent remoteness of use of fissionable material for nonmilitary purposes led to the conclusion that private enterprise could not alone accomplish the production of fissionable material and the development and production of new products and processes. The nation's responsibility to insure that this great power

of destruction should not be misused also led to the conclusion that a strict governmental monopoly and rigid controls were required. At the same time it was recognized that American industry might make great contribution to the work in contemplation and that governmental authority should be authorized to engage the assistance of private industry and industrial organizations.[14] Thus the Atomic Energy Act of 1946, after creating the Atomic Energy Commission, to be staffed by civilians, provided in § 4 (60 Stat. 759, 42 U.S.C.A. § 2061) that the Commission, as agent of the United States, should be the owner of all facilities for the production of fissionable material, with certain exceptions immaterial here; the Commission was authorized and directed to produce fissionable materials in the facilities it owned, but was authorized also to contract with others for the production of such materials in the facilities owned by the United States.

In August 1949, the Russians successfully exploded an atomic bomb. This led the Atomic Energy Commission and other officials of the United States to reappraise the position of this nation and, ultimately, to a decision to undertake the development and construction of a thermonuclear weapon. In June, 1950, du Pont was asked to lend its experience, its organization and its service in the design, construction and operation of a new plant which was essential to the new program. Du Pont undertook to do this, again for a fee of one dollar. Du Pont entered upon this work in August 1950 and its president advised its stockholders in October of that year of the new undertaking of their company. He told the stockholders that the work had been undertaken only at the request of the government, because it was said to be of vital importance to the security and defense of the United States. He referred to the withdrawal of the company from the management contract of the Hanford Engineer Works in 1946, because, he said, management had believed that the

---

14. See S.Rep. No. 1211, 79th Congress, 2nd Session.

interest of the company required its concentration during peacetime in its field of chemistry, while the development of nonmilitary uses for atomic energy should be left to those companies whose commercial interest and experience were more closely related to physics. The stockholders were told that the undertaking would require the detachment of many executives and technical employees, whose services were profitable to the company, but that the project was undertaken as the company's contribution to the defense effort, in the light of which it seemed inappropriate that it require a fee for its services.

A tract of some 200,000 acres of land in Aiken, Barnwell and Allendale Counties, South Carolina, was acquired. Upon this tract nine principal plants were constructed with supporting facilities. One of the nine principal plants, known as the fuel element fabrication plant, alloys, casts, extrudes, machines and treats uranium and other metals and fashions them into precise dimensions for subsequent use in the reactors. A heavy water plant, through processes of extraction and distillation, produces heavy water from river water, heavy water being found in the natural water to the extent of 15/1000ths of one per cent. There are five separate heavy water moderated reactors in which plutonium and other products are produced from the fuel materials. In two chemical processing plants usable and desired products are extracted from materials produced in the reactors.

These plants are supported by administration facilities, maintenance and repair shops, warehouses, health laboratories for the protection of personnel, an electric power system comparable to that of the State of Delaware, a water pumping and distribution system approximating that of the City of Philadelphia, railroads, highways, and a research and development center to aid in the production of the entire Savannah River Plant.

The Savannah River Plant was designed and constructed, and is now operated by du Pont under a contract dated September 30, 1953, but effective as of August 1, 1950, as of which date the work had commenced. The definitive contract replaced an earlier letter contract with substantially similar terms. The contract provides in a very general way for architectural and engineering services, for the construction of unspecified plants and facilities and their subsequent operation, for research and development, and for personnel training programs, all, however, as required by the Commission and subject to its approval. By Article XIII, it was provided that the title "to all materials, tools, machinery, equipment and supplies procured under this contract by the Contractor shall vest in the Government whenever title passes from the vendor * * *," and it requires that all Government property be marked and identified as such. The right of the Government to furnish directly materials and supplies was recognized. Du Pont must be reimbursed for all of its costs and expenses in connection with the project, for the purpose of which the contract provides for a revolving fund to be deposited by the Government with banks designated as depositaries of public moneys. The balances from time to time in each of those bank accounts, under the contract, are the property of the United States, and the banks are required to treat the deposits as public deposits. Du Pont, however, was to be authorized to draw against such funds in payment of purchases and expenses, subject, of course, to the provision for the Commission's control and supervision. Du Pont was required to maintain accounting records, separate from the records of its own commercial transactions, to reflect its operations of the Savannah River Plant only, and the Commission is given the right to inspect and audit those books and all other activities of du Pont at any time it deemed appropriate. All patents, drawings, designs, specifications and technical data, issued as a result of, or growing out of the work, belong to the United States. In Article XXXIV, recognition is given to the fact that du Pont is to do the work for a fixed fee of one

dollar, and that the work entails "unusual and unpredictable hazards," in the light of which the contract provides that the United States shall reimburse du Pont for, indemnify it and hold it harmless against, any loss or expense (including expense of litigation), or damage (including discharge of tort liabilities), despite the fact that the expense, or the loss, may have been occasioned by the fault of du Pont's employees. The only exception is for loss, or expense, caused directly by the bad faith, or misconduct, of one of du Pont's elected general corporate officers acting within the scope of his authority.

These provisions of the contract are sufficient to show that the lengthy document is unusual. It was entered into by a contractor without hope of gain, except the nominal one dollar, payable upon final completion of the contract, but upon whom was imposed no risk of loss. Du Pont was not even required to lend its credit or its funds. That it was contemplated that du Pont would act as the *alter ego* of the Commission is further suggested by the contract requirement that du Pont include in subcontracts a number of provisions applicable to public contracts. Illustratively, 41 U.S.C.A. § 22 requires that "in every contract or agreement to be made or entered into, or accepted by or on behalf of the United States, there shall be inserted an express condition that no Member of or Delegate to Congress shall be admitted to any share or part of such contract or agreement, or to any benefit to arise thereupon. * * *"; that du Pont was required to insert that and other public contract requirements into its subcontracts, suggests the parties regarded the subcontracts as ones "entered into * * * by or on behalf of the United States."

The procurement procedures were worked out, pursuant to provisions of the contract, by mutual agreement of the AEC and du Pont. The Purchase Order form provides, as its first term:

"Title—The material to be furnished hereunder is for the benefit of the United States Government and title thereto will pass to the United States Government from Seller upon delivery, subject to subsequent inspection and acceptance of the material by du Pont and the Government; if specifications are not met, material may be returned at Seller's expense."

Other provisions of the Purchase Order form make applicable the covenants and conditions governing public contracts to which general reference has been made.

Generally the contract authorizes du Pont to make subcontracts and purchases and changes in subcontracts and purchases involving an expense of less than $10,000 without prior consent or Commission approval; otherwise the specific, advance approval of the Commission is requisite. In dollar amount almost seventy-five per cent of the purchases have been in the latter category and were made with the prior specific approval of the Commission.

To provide the supervision and control contemplated by the contract, the Commission maintains at the Savannah River Plant a staff of approximately 230 people divided into eight divisions to parallel du Pont's organizational divisions. Each of these divisions works in close collaboration and supervision with its counterpart in the du Pont organization.

There was early agreement between the Atomic Energy Commission and the South Carolina Tax Commission that purchases of materials and supplies for the Savannah River Plant were not subject to South Carolina sales or use taxes. The contract between the AEC and du Pont assumed such immunity from taxation on both constitutional and statutory grounds, and required du Pont to inform AEC of any attempt to levy or collect such taxes and, if directed by AEC, to pay them under protest (presumably, by drawing upon the bank balances of the United States established for the purpose of enabling du Pont to pay expenses of the project) and to assign to AEC rights to have such taxes abated or refunded. The agreement of the South Carolina Tax Commission, however, was apparently

founded upon the provisions of § 9(b) of the Atomic Energy Act of 1946 (60 Stat. 765), which specifically provided, in its last sentence:

"The Commission, and the property, activities, and income of the Commission, are hereby expressly exempted from taxation in any manner or form by any State, county, municipality, or any subdivision thereof."

When that sentence was repealed, the South Carolina Tax Commission took the position that, beginning October 1, 1953, du Pont would be required to pay sales or use taxes upon all such purchases. Subsequently the position of the Tax Commission was extended to include a claim of use tax upon delivery to the Savannah River Plant of materials purchased by the United States for the purpose of use at that plant.

It is true that in Carson v. Roane-Anderson Company, 342 U.S. 232, 72 S.Ct. 257, 96 L.Ed. 257, a contractor supplying certain municipal services to the AEC at Oak Ridge was held exempt from local taxation upon the basis of the provision of § 9(b) of the Act as it then existed. This was in recognition of the repeatedly expressed principle that the Congress has the power to extend immunity from taxation beyond the limits of that to be implied from the Supremacy Clause of the Constitution, art 6, cl. 2. The court thus did not reach the question of implied constitutional immunity. It was because of that decision of the Supreme Court that the last sentence of § 9(b) of the Atomic Energy Act of 1946 was repealed. In doing so, however, the Congress did not intend to confer upon the states the power to tax activities of the United States entitled to immunity under the Constitution. It was clearly the intention to withdraw from the Atomic Energy Commission and its activities any immunity from taxation beyond its constitutional immunity, and to leave it, with respect to such taxes, on the same basis as other governmental agencies and activities.[15]

Thus we have for decision the constitutional question.

At issue are South Carolina sales taxes upon the purchase from South Carolina vendors of supplies for the Savannah River Plant during the period October 1, 1953–March 20, 1954,[16] the tax amounting to approximately $52,000 and use taxes upon purchases from out-of-state vendors during the period October 1, 1953–March 31, 1958, the tax amounting to approximately $1,700,000.

The doctrine of mutual immunity of state and of nation from taxation by the other, enunciated by Chief Justice Marshall in M'Culloch v. State of Maryland, 4 Wheat. 316, 4 L.Ed. 579, has not lost vitality with age. If, at times, it has seemed that "the line between the taxable and the immune has been drawn by an unsteady hand,"[17] the basic principle that the United States, its property, its essential functions and activities are not subjects of taxation by the states has not been questioned in modern times.

The doctrine was born of the necessity of protection of the functions of each sovereignty, operating in the same territory, from a frustrating taxing power of the other. Since the principle requires immunity from the economic burden of

---

15. S.Rep. No. 694, 83rd Congress, 1st Session.

16. Prior to March 20, 1954, the South Carolina Sales Tax Act levied the tax upon the seller, but specifically required that he collect the tax from the purchaser. As of March 20, 1954, an amendment became effective, which repealed the requirement of collection of the tax from the purchaser. On and after March 20, 1954, South Carolina vendors have presumptively paid the tax and there is no question here about sales taxes upon such sales. Prior to March 20, 1954, purchases from South Carolina vendors had been effected free of the sales tax under an exemption certificate of the South Carolina Tax Commission, which obligated the purchaser to pay such sales taxes as may be found to be due.

17. United States v. County of Allegheny, 322 U.S. 174, 64 S.Ct. 908, 910, 88 L.Ed. 1209.

the other's taxes, it is not surprising that in an earlier year when governments were small and taxes and economics less complex, a concentration upon the economic burden should have led to an extension of the doctrine to persons dealing with the governments. Taxation of salaries of government employees and of the activities of vendors to government of goods and services created an economic burden readily perceived, if imperfectly measured. Carried to its extreme in modern society, however, the logical extension of the doctrine would be ridiculous. Economists may estimate the total tax increment in the cost of a complicated machine or of construction of a building, but an attempt to relieve a purchasing sovereign of the economic burden of all taxes, however remote and indirectly imposed, would not only be impossible of accomplishment, but would seriously disrupt the functions of each of the dual sovereignties. Confinement of the extension was difficult, for distinctions between imposts more or less remote and indirect frequently lacked substance. Furthermore, it was not easy to see why the obligations of a manufacturer to the state and community, whose protection and services he enjoyed, should vary with the fluctuations in the ratio of his sales to the United States to his total sales.

In a series of cases, beginning with James v. Dravo Contracting Company, 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155, the extension was withdrawn. There it was held that West Virginia might include in the measure of her gross receipts tax upon a contractor, receipts from the United States for work done in West Virginia. Washington's occupation tax measured by the gross income of a contractor engaged in the construction of Grand Coulee Dam was sustained in Silas Mason Company v. Tax Commission, 302 U.S. 186, 58 S.Ct. 233, 82 L.Ed. 187.

Superficially, there is an appearance of difference in the immediacy of the tax between a contractor supplying goods and services for a fixed price and one supplying similar goods and services under an agreement that he will be reimbursed for his direct expense and paid an additional fee designed to cover his overhead and indirect expense and to allow some profit. Generally, the difference is insubstantial, for the selection of an optional method of price determination does not alter the technical incidence of a tax on the contractor or its substantive relation to the purchaser. In the one case, it is clear that no part of the burden of the tax was absorbed by the contractor, while in the fixed price contract it may be debatable, but that is the limit of the difference. If contracting officers of the United States find good reason to believe that particular goods and services may be acquired more cheaply or more expeditiously under a cost-plus-fee contract than under a fixed price contract, they may, if authorized, elect to determine the price in that manner, but they do not thereby effect any substantial change in the relation between the contractor's taxes and the United States. It is frequently said [18] that Congress has the power to extend the immunity of the United States beyond the constitutional limits, but a contracting officer has no such power, and existence of the immunity should not be made to depend upon the form in which he chooses to cast the contract. Furthermore, a contractor's obligations to his state would not seem to vary with the methods employed to compute his prices.

In State of Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3, the Supreme Court recognized that the difference in the two types of contracts was not a distinction upon which the immunity question should turn. The court sustained Alabama's tax upon a sale of lumber to a contractor for use in constructing an army camp under a cost-plus-fee contract. The contract provided that title to materials delivered by the contractor to the job site should pass to the United States after inspection and writ-

18. Carson v. Roane-Anderson Company, 342 U.S. 232, 72 S.Ct. 257, 96 L.Ed. 257; United States v. City of Detroit, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424; City of Detroit v. Murray Corporation, 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441.

ten acceptance by a contracting officer acting for the United States. Meanwhile, title to materials was in the contractor, who had purchased them on his own credit and who, presumptively, could have diverted them to other purposes. Title to materials rejected by the contracting officer would never pass to the United States under the contract. Though this particular lumber had been inspected and accepted prior to its purchase, and title, therefore, vested in the United States upon its delivery to the job site, the Supreme Court recognized that the situation was essentially the same as that considered in James v. Dravo Contracting Company, 302 U.S. 134, 58 S.Ct. 208, 82 L.Ed. 155.

In the companion case, Curry v. United States, 314 U.S. 14, 62 S.Ct. 48, 86 L.Ed. 9, the Supreme Court sustained Alabama's use tax upon the same contractor involved in King & Boozer, when he used in the work building materials he had purchased from an out-of-state vendor.

As the Supreme Court demonstrated and emphasized, the purchases with which it was concerned in King & Boozer and in Curry were those of the contractor, not those of the United States. Implicit in the decisions is the assumption that had the purchases been those of the United States, they would have been exempt from Alabama's sales tax, which the vendor was required to collect from the vendee, and from her use tax.

Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546, decided that purchases by a contractor, who had been constituted purchasing agent for the Navy Department in connection with the construction of an ammunition depot, were those of the United States and immune from the Arkansas sales tax. Acting pursuant to the contract, the contractor's purchase orders disclosed that the purchases were for the United States and provided that title to the purchased goods should pass from the vendor to the United States.

In Kern-Limerick there was a substantial question of the authority of the contracting officers to constitute the contractor the purchasing agent of the government, but there is no such question here. This appears to be the sort of contract Congress had in contemplation in 1946 when it considered the role of American industry in the nuclear program. There was a background of the experience of the Manhattan District Project which had accomplished its gigantic task with the aid of private industry enlisted under managerial contracts. Thus, the Congress, insisting that the facilities be owned and controlled by the United States, permitted the AEC to engage the assistance of industry. Had there been no pressure of urgency, the AEC, in time, conceivably could have developed an organization of managerial, technical and administrative competence and experience comparable to that readily available to it in the larger industrial organizations, but Congress gave it the choice. What resulted amounts to a management contract, and there seems no good reason that purchasing authority, subject to the strict controls of AEC, could not be delegated to the managers of the project just as it would have been if they had been employed by AEC individually rather than collectively.

This type of contract, and the substantive relation of the parties, made it all the more appropriate that the contract require that title to all goods and materials purchased should pass directly from the vendors to the United States. Du Pont's credit was not to be advanced or risked. Its disclosures in its requests for quotation and its purchase orders that the goods were being procured for the United States, to whom title would directly pass, and its imposition of the terms required of public contracts with the United States, negatived any individual liability of its own.[19] What obligations did arise from the purchase orders were discharged by drawing directly upon public funds.

19. See Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546; Restatement, Agency 2d § 320 (1958).

Nevertheless, it is insisted that du Pont was not the agent of the United States for procurement purposes. This insistence is founded upon the fact that the contract does not apply the word "agent" to du Pont in connection with procurement, but does specifically provide that du Pont, as agent of the United States, may lease government housing and real estate. An agent, however, need not be called by that name to be one. Liabilities of principals and immunities from taxation are not dependent upon the use, or omission, of a magic label. It is clear that du Pont's procurement activities were authorized, and were openly on behalf of the United States, and at the government's expense and risk.

■ We conclude that du Pont's procurement activities resulted in the sale of goods and services to the United States, that the purchases were those of the United States and immune from ordinary sales and use taxes upon the purchaser or upon the purchasing agent. Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 74 S.Ct. 403, 98 L.Ed. 546; Avco Manufacturing Corporation v. Connelly, 145 Conn. 161, 140 A.2d 479; United Aircraft Corporation v. Connelly, 145 Conn. 176, 140 A.2d 486; Tawes v. Aerial Products, Inc., 210 Md. 627, 124 A.2d 805; General Motors Corporation v. State Commission of Revenue and Taxation, 182 Kan. 237, 320 P.2d 807; cf E. I. Du Pont de Nemours & Co. v. State, 44 Wash.2d 339, 267 P.2d 667.

■ The Tax Commission contends, however, that South Carolina's use tax is not limited to uses incident to ownership, but reaches transfers of possession independent of the title.[20] They contend that du Pont had a separable beneficial and taxable use of all goods and materials whether procured by it or by AEC, for their use was necessary to du Pont's performance of its contractual obligations.

They invoke the theory of City of Detroit v. Murray Corporation, 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441. That du Pont had a separable and beneficial use of this government property they seek to establish by two separate contentions.

First, they say that, while du Pont's procurement [21] during the period in question resulted in the purchase of goods costing roughly $557,085,000, some of those purchased goods costing $1,379,000 (less than $^{25}/_{100}$ths of one per cent of the total) were commercial products of du Pont. The argument is that du Pont accepted the contract for the purpose of furthering sales of its commercial products, and that its assumed profit upon such sales makes its use of all other goods for its separable benefit as well as that of the United States.

The contract contemplated that some of du Pont's commercial products would be used, and provided that, in supplying them, du Pont would do so as a subcontractor, not as the prime contractor. The procedure, when products of du Pont's commercial organization were required, was: (1) du Pont submitted to AEC a price proposal, (2) AEC, in addition to all of its other supervision of purchases and their need, solicited bids from others, and (3) thereafter AEC made the decision about the order. AEC awarded to others purchase orders for goods costing $1,112,000 upon which du Pont had offered price quotations. In a mammoth operation of the nature of the Savannah River Plant, it would be expected that the du Pont company would be among its suppliers by whomever it was managed. Whether or not du Pont might have supplied precisely the same amount of goods, if another had been the manager, we cannot say, but careful safeguards were employed to assure that du Pont's managerial functions did not influence the procurement of du Pont's.

20. The taxable use is defined by § 65–1367 of the South Carolina Code of Laws, 1952, as "* * * the exercise of any right or power over tangible personal property incident to the ownership of that property or by any transaction

in which possession is given, except that it shall not include the sale of that property in the regular course of business."

21. This does not include materials and fuels supplied by AEC.

products, and the difference, if any, was minuscule in the context of this controversy.

Next, says the Tax Commission, du Pont scientists and technicians are acquiring knowledge and experience which may be of greater value to du Pont in some future year than the knowledge, experience and maturity they would have gained had their previous service to du Pont's ordinary activities, and its profit, not been interrupted. This speculation ignores the history of du Pont's withdrawal in 1946 from the management of the Hanford Engineer Works, its reluctant acceptance of its present commission, and the fact that the work at Savannah River Plant is now, and, in all likelihood, will long remain, a monopoly of government.

There is every indication that du Pont accepted this contract and its obligations out of the high sense of public responsibility, despite deprivation, which its president expressed to its stockholders in 1950.

If the Tax Commission's speculation that du Pont's motivation was not entirely unselfish was accepted, however, the United States is still immune from state taxation. For the possessor of government property to have a separable, taxable use measured by the value of the government property much more is required than would be provided by complete acceptance of the Tax Commission's hypothesis.

The custodian of a federal post office building is paid for the performance of his duties, but his use of the materials he requires in the performance of his housekeeping duties is so completely that of the United States that no one would think of taxing him upon the value of the materials. In each of the Detroit cases,[22] the Supreme Court was concerned with taxation of a completely separate business enterprise which used government property for its purposes of

profit and which derived as much advantage from the use as if it had legal title to the property. No such condition is to be found here. The use of the Savannah River Plant and of goods and materials purchased for its operation is so completely that of the United States, that, while one may concede the possibility of advantage to others, those others do not become subject to taxation upon the value of the plant or its purchases when, by contract, and in good conscience without a contract, the United States must pay any tax exacted. In a sense, of course, du Pont may be said to have the use of all of the materials and facilities at the Savannah River Plant, but in the same sense it may be said that the individual members of the AEC have the use of all of the facilities entrusted to their care. See Avco Manufacturing Corporation v. Connelly, 145 Conn. 161, 140 A.2d 479; United Aircraft Corporation v. Connelly, 145 Conn. 176, 140 A.2d 486; General Motors Corporation v. State Commission of Revenue and Taxation, 182 Kan. 237, 320 P.2d 807.

Perfect accommodation of the conflicting interest of the sovereign not to be taxed and of a dual sovereign to exercise its power of taxation cannot be achieved by judicial declaration of constitutional principle. Had AEC employed directly those individuals who, technically may be said to be employees of du Pont, the impact upon the state, local communities and their finances would be the same. That impact is not inconsiderable. Governmental acquisition of large properties and their consequent withdrawal from local taxation creates a burden, sometimes intolerable, which is greatly augmented by an influx of employees of the new enterprise, who, with their families, create new demands for schools and other services provided by the state and its political subdivisions. Congress has not been unaware of that problem, however, and has recognized its obligation of rec-

---

22. United States v. City of Detroit, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424; United States v. Township of Muskegon, 355 U.S. 484, 78 S.Ct. 483, 2 L.Ed.2d 436; City of Detroit v. Murray Corporation, 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed. 2d 441.

ompense. In § 9(b) of the Atomic Energy Act of 1946,[23] Congress directed:

"In order to render financial assistance to those States and localities in which the activities of the Commission are carried on and in which the Commission has acquired property previously subject to State and local taxation, the Commission is authorized to make payments to State and local governments in lieu of property taxes. Such payments may be in the amounts, at the times, and upon the terms the Commission deems appropriate, but the Commission shall be guided by the policy of not making payments in excess of the taxes which would have been payable for such property in the condition in which it was acquired, except in cases where special burdens have been cast upon the State or local government by activities of the Commission, the Manhattan Engineer District or their agents. In any such case, any benefit accruing to the State or local government by reason of such activities shall be considered in determining the amount of the payment. * * *"

Such payments, we are told, are being made. If they are to be increased or diminished, it should not be by a recognition of an absolute power of the recipient to measure and command them.

An appropriate order enjoining the defendants from exacting sales and use taxes from the United States, in addition to the contributions already made, will be entered.

SOBELOFF, Chief Judge, concurs.

TIMMERMAN, District Judge (dissenting).

This is an action by the United States and E. I. du Pont de Nemours and Company (hereinafter called du Pont), as plaintiffs, against the Members of the South Carolina Tax Commission (hereinafter called Tax Commission), both individually and officially, as defendants, to enjoin the collection from du Pont (not the United States) of sales and use taxes imposed by valid Statutes of the State of South Carolina.

There is no contention that the tax statutes are unconstitutional because they apply unequally or discriminatorily to du Pont. The rates and conditions of the relevant tax statutes apply to du Pont just as they apply to all others in like situation. The taxes are imposed for the desirable and lawful purpose of providing and maintaining a system of public education, among the beneficiaries of which are the thousands of children of du Pont's employees, working in South Carolina on the Savannah River Project.

In considering this case a few fundamentals should be kept in mind. Without them as guides a wrong decision could be easily reached. They are, (a) that the plaintiffs have the burden of proof; (b) that self-serving declarations are not evidence where no opportunity for cross examination is afforded; (c) that information aliunde the record is not proof in the case; (d) that there is no presumption that a State remedy is not plain, speedy and efficient; and (e) that one invoking the jurisdiction of a court of equity must come into court with clean hands.

The first and primary prayer of the complaint is for the Court to hold "that the South Carolina Sales and Use taxes * * * cannot validly be imposed against the plaintiff du Pont". The basis of this prayer is the fact that the Atomic Energy Commission (hereinafter called AEC), an admitted agency of the United States, entered into a contract with du Pont to design and construct and, after construction, to operate the government project, now commonly referred to as the Savannah River Project, for the considerations and benefits expressed in the contract. In the contract du Pont is referred to both as "Contractor" and as "prime contractor".

Of first consideration is the issue of this Court's jurisdiction. Section 1, Ar-

---

23. 60 Stat. 765, 42 U.S.C.A. § 2208.

ticle III, of the Constitution of the United States provides that, "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish * * * ". Since Congress alone has the power to create inferior Courts, such as this district court, it alone has the power to fix the bounds of their jurisdiction; and it alone may legally change the limits of that jurisdiction from time to time. Congress, acting in fulfillment of this constitutional responsibility, has denied jurisdiction to this Court in this case in these words:

> "The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State". Section 1341, Title 28 U.S.C.A.

Does State law afford du Pont a plain, speedy and efficient remedy for testing the legality of the taxes imposed on it? If it does, then this Court is denied jurisdiction to grant an injunction as prayed for. The plaintiffs contend that the State does not afford an adequate remedy because, as they argue, it doesn't provide "for the payment of interest upon the amount of the tax so paid in the event that the taxpayer is successful in his suit for recovery of the taxes" (Plaintiffs' brief).

There is nothing in the federal constitution that requires a sovereign state to pay interest, unless it obligates itself to do so; and no constitutionally empowered legislative body, except a State's own legislature, has the power to enact a law requiring a sovereign State to pay interest on refunded taxes. The proposition that a taxpayer is not afforded an adequate remedy for testing the validity of a state tax, where the taxpayer is required to pay the tax before instituting proceedings to recover it, and when no provision is made for the payment of interest on the amount refunded, was first advanced by Judge Learned Hand in Procter & Gamble Distributing Co. v.

Sherman, D.C.N.Y., 2 F.2d 165. See also Procter & Gamble Co. v. Newton, D.C., 289 F. 1013, for background. Section 1341, as quoted above, was not in existence at the time Judge Hand's opinion was rendered. He laid down that doctrine, unsupported by any precedent decision or existing legislation and without constitutional sanction. Judge Hand's opinion is in direct conflict with the opinion in United States v. State of North Carolina, 136 U.S. 211, 216, 10 S.Ct. 920, 922, 34 L.Ed. 336, wherein Mr. Justice Gray, speaking for the Court, said, "Interest * * * is not to be awarded against a sovereign government, unless its consent to pay interest has been manifested by an act of its legislature, or by a lawful contract of its executive officers".

It was agreed by Judge Hand that he had been referred to no decision that sustained his point; and he evidently knew of no case that supported his position, else he would have cited it. It is no justification for the position to say that "a dollar to-day is worth more than a dollar next year" [2 F.2d 166]. That is but a trite saying, a cliche, too unsubstantial to supplant the sovereignty of a sovereign state, if indeed a mere court decision could accomplish that result. Whether or not the district court has jurisdiction of this case must be determined on the basis of the inhibition against jurisdiction found in Section 1341. If the State has provided a plain, speedy and efficient remedy, jurisdiction does not exist in this Court.

It is no answer to the jurisdictional issue to say that the United States is not mentioned in Section 1341 and, therefore, that said Section does not limit or defeat the government's right to avail itself of the district court's jurisdiction. That is a *non sequitur*. The government cannot avail itself of a non-existing jurisdiction, and no one is arguing that the United States cannot avail itself of a jurisdiction that does exist. The Attorney General of the United States cannot invest a court pleasing to him with jurisdiction to hear an issue simply be-

cause he wishes to avoid a court that does have jurisdiction. He must take that issue to a court that has jurisdiction to hear it. It isn't the government's right to invoke a jurisdiction that exists, but it is the government's right to invoke a jurisdiction that doesn't exist that is in question. Certainly this case could not have been brought in the original jurisdiction of the Circuit Court of Appeals. The simple reason for that is that Congress has not conferred power on the Circuit Court to hear such cases as a part of its jurisdiction. Congress created the Court of Claims that sits in Washington and defined its jurisdiction. That Court cannot exceed the jurisdiction which Congress intrusted to it even though the Attorney General of the United States might want it to do so. Here we have an Act of Congress that prohibits this Court from doing what the plaintiffs have asked it to do, to wit: to enjoin the assessment, levy and collection of the State's sale and use taxes, although State law provides a plain, speedy and efficient remedy for determining the validity of such taxes. The issue here is not whether the parties themselves are within the jurisdiction of this Court. It is that this Court doesn't have jurisdiction of the subject matter because an Act of Congress denies it such jurisdiction. Since the district courts are statutory courts their jurisdictions are established by statute. It makes no difference who may request a district court to do so, it cannot legally go beyond the limits of its jurisdiction as fixed by Congress.

The effect of the majority opinion, if allowed to stand, will be to restrict the sovereignty of the states; it will take away from them the power to determine when they will or will not pay interest on their obligations. The remedy that the State provides for a taxpayer feeling himself aggrieved is in effect this: The taxpayer pays his tax, under protest, before it is in default. He then has thirty days within which to commence an action in the appropriate State Court to recover the tax paid under protest, and thereby to test the validity of the tax. If the tax is held valid, the State retains what was paid and uses it for the purpose for which it was imposed, and the contesting taxpayer by following the State remedy saves penalties and interest that otherwise would be chargeable against him. If the tax is held invalid, the taxpayer is refunded the amount paid with or without interest as the State Court may determine.

If the remedy afforded the taxpayer by the State is given fair consideration, it will lead unerringly to the conclusion that the remedy afforded the taxpayer by the State is both fair and considerate. There is nothing abstruse about the remedy; it is plain enough for the average high school student to understand, and it is quite speedy. If it were speedier, no doubt plaintiffs would now be complaining that it is too speedy. The majority has pointed out no lack of efficiency in the remedy, and there is no legitimate presumption that the remedy is inefficient. The object of the remedy is to determine the validity of the tax. If that object is attained, as undoubtedly can be done under the State procedure, it certainly will not prove its inefficiency. There is no fact established in this record to which the majority can point as establishing the inefficiency of the remedy. Surmise is its only support. Hence I would hold that this Court has no jurisdiction of this case and I would dismiss it. Failing in that, I would stay proceedings in this Court and give the plaintiffs a reasonable time within which to have their cause heard in the State Court, retaining jurisdiction in the meantime. See: Leiter Minerals, Inc. v. United States, 352 U.S. 220, 77 S.Ct. 287, 1 L. Ed.2d 267; City of Meridian v. Southern Bell Tel. & Tel. Co., 358 U.S. 639, 79 S.Ct. 455, 3 L.Ed.2d 562; George F. Alger Co. v. Peck, 74 S.Ct. 605, 347 U.S. 984, 74 S.Ct. 853, 98 L.Ed. 1148; and Shipman v. Du Pre, 339 U.S. 321, 70 S.Ct. 640, 94 L.Ed. 877.

Now, as stated by the majority in their opinion, "we come to the merits".

At the outset, I think it well to call attention to the fact that in another

case growing out of the Savannah River Project, in which du Pont was the sole defendant and was represented by the Attorney General of the United States, it was held that du Pont was the prime contractor, that it was bound by the terms of an agreement it had with a subcontractor, and that neither the United States nor the AEC was a necessary party to the action, although the government was obligated by its contract with du Pont to reimburse du Pont for any recovery had against it by the subcontractor. E. I. Du Pont De Nemours & Company v. Lyles & Lang Construction Company, 4 Cir., 219 F.2d 328, certiorari denied 349 U.S. 956, 75 S.Ct. 882, 99 L. Ed. 1280.

The contract between AEC and du Pont was entered into September 30, 1953, and made retroactively effective August 1, 1950. Thus du Pont was made the prime contractor and it was engaged in designing and constructing the Savannah River Project from the beginning, or for three years and two months before the final contract was executed. The plaintiffs claim that du Pont's operations during the first three years and two months were pursuant to a "Letter Contract".

Section 1 of Article II of the 1953 contract provides in part as follows:

"The *Contractor is* requested and *authorized,* subject to the approval of the Commission as hereinafter set forth, *to furnish or procure* in the shortest practicable time *the labor, materials, tools, machinery, equipment, facilities, supplies* and services (not furnished or procured by the Government) and *to do all things which in the Contractor's judgment are necessary or desirable* for the development, design, construction, installation and operation of new production facilities * * *". (Emphasis added.)

Section 2 of the same Article provides in part:

"The *new production facilities* contemplated hereunder *will involve certain technical developments which go beyond any experience which has* *been had* at the Hanford Project or any other installation of the Commission and the attainment by the Contractor of the objectives of the project cannot be assured. The Contractor undertakes to use all reasonable efforts to carry out the project and to attain the objectives thereof * * *". (Emphasis added.)

Section 3 of Article III provides:

"*The Contractor shall furnish or procure architect-engineer and other services incident to design, procurement of materials and equipment, inspection and supervision of the construction of the Plants*". (Emphasis added.)

There are other provisions in the contract that need not be quoted here but which, when considered with those already cited, clearly indicate the relationship between du Pont and the government. All of them point unerringly to the one conclusion, that du Pont was and is an independent contractor on the Savannah River Project.

I do not agree with the majority that du Pont entered into the contract here in question "without hope of gain, except the nominal one dollar, payable on final completion of the contract". This in effect says that the majority believes that du Pont accepted the prime contractorship of an enterprise that has already cost well over a billion dollars, and would keep it engaged for more than eight years for the pittance of twelve and a half cents per year or less.

There is no contention that du Pont is an eleemosynary corporation. It would be impossible for it to possess the immense wealth which it does possess doing what it is now claimed it has been doing for the past eight years—working for nothing. What right has the management of a highly competitive business corporation to use its skills and managerial abilities for the sole benefit of others without pay? By way of explanation of this unusual conduct it is claimed that the President of du Pont wrote a letter to the stockholders, but there is no

proof that the stockholders were consulted in an effective way and that they agreed for du Pont to do what is now claimed it has been doing for eight years —working for nothing. Did the stockholders agree to forego dividends for the benefit of the Government? If so, where is the proof? All that I have seen in the record bearing directly on this point is what purports to be a copy of a letter written by the President of du Pont "To the Stockholders of E. I. du Pont de Nemours & Company", under date October 18, 1950, and without any addresses given. This circular letter by Mr. Greenwalt the President of du Pont, didn't ask the stockholders, it told them that "the du Pont Company has executed a Letter Contract covering the design, construction and operation of new production facilities for atomic materials".

It is the duty of a Court to take into consideration the reasonableness of any statement or contention made by a litigant, or in its behalf. It is conceded that du Pont sold to itself as contractor a little less than one and a half million dollars of its products at retail prices. No one has testified in open court under oath what rightfully was the producer's profit, what rightfully was the middleman's profit, or what rightfully was the retailer's profit; nor do we know the sum of those profits. Whatever they amounted to in the aggregate, du Pont got. Did the total amount to three-fourths of a million dollars or to half a million dollars? Whatever the amount, plaintiffs claim it is inconsequential. Had du Pont produced the facts, the Court would not now be left to conjecture. Moreover, nothing has been told the Court about profits on products purchased from other large corporations in which du Pont may have held large blocks of stock, as for instance, the General Motors Corporation.

The contract obligates the government to reimburse du Pont for an undisclosed percentage of du Pont's overhead. The amount to be paid du Pont was to be calculated on the basis of an agreed formula. The Court was shown a copy of the formula after all essentials of the formula had been x'd out. In that form it does not give information; it conceals information. All the Court has is the plaintiffs' contention that the amount contributed by the government to du Pont's overhead is a top secret.

Section 2, Article XVI of the contract also obligates the government to make another contribution to du Pont. It is to pay du Pont for all extra compensation, awarded as incentive pay to the du Pont employees assigned to the Savannah River Project. As stated in this Section " * * * all * * * extra compensation hereunder shall be in the form of common stock of E. I. du Pont de Nemours and Company acquired by the Contractor [du Pont], or in the form of cash to be invested in new common stock of E. I. du Pont de Nemours and Company issued by the Contractor [du Pont] directly to the employees, or in the form of cash, or in two or more of such forms; * * * ".

No value is fixed for the du Pont stock given to the employees as extra compensation. Since du Pont was the owner of the stock awarded and was reimbursed for it, shouldn't it be known what du Pont received for it? How else can it be known whether a profit was or was not made. I have seen no facts and I have heard none testified to that would form the basis of an opinion as to whether du Pont has or has not profited by the sale of its stock to the government, or in effect to the government. The plaintiffs have the burden of proof, and there is no presumption that what they contend is true in the absence of proof.

It is hard to know without a complete disclosure of all the facts what profit du Pont will derive out of the Savannah River Project, but we do know enough to know that it has amounted to, or will amount to far more than the plaintiffs admit. We also know, historically speaking, that those who were the first to learn the potentials of petroleum were the ones who first grew immensely wealthy in the

development of them. Will not the same hold true in the development of the vast potentials of the atom for peace time uses?

Upon the hearing of this case, the suggestion that du Pont may have been the recipient of a wide and valuable atomic experience in designing, constructing and operating the Savannah River Project was made light of by plaintiffs. The same notion appears in the majority opinion. In Section 1, Article II of the Contract, cited above, it was agreed that, "The Contractor [du Pont] is * * * authorized [at public expense] * * * to furnish or procure in the shortest practicable time the labor, materials, tools, machinery, equipment, facilities, supplies and services * * * and *to do all things which in the Contractor's [du Pont's] judgment are necessary or desirable for the development, design, construction, installation,* and operation of new production facilities * * * *".* (Emphasis added.) Why all the hurry to develop, construct and operate *new production facilities*? Has all the propaganda coming out of Washington about the peace time uses of the atom been a hoax? I think not. What were the uses to which petroleum was put in the 1880's, and what now?

Sections 1 and 2, Article II of the Contract clearly indicate the purpose of the Savannah River Project to be the development of production facilities theretofore unknown in the atomic energy field. The Savannah River Project was to become the last word in that field, and as we are now led to believe it is the last word in the atomic field. Du Pont knows the process from a to z, but its competitors do not. How any one, even a rabid partisan, could actually believe that such knowledge and experience as du Pont gained on the Savannah River Project has little or no material value is hard to understand.

The taxes which plaintiffs seek to have declared not legally assessable against du Pont are South Carolina sales and use taxes which were imposed by appropriate legislation, Act No. 379, Acts of the General Assembly of South Carolina, approved April 19, 1951. This legislation is incorporated in the 1952 South Carolina Code of Laws, Chapter 15, Title 65. Pertinent amendments to the code sections since its codification are shown in the Supplement to the 1952 South Carolina Code of Laws.

One of the periods involved in this action is the period from July 1, 1951 (effective date of the South Carolina Sales and Use Tax Act) to October 1, 1953, when Congress deleted the last sentence of Section 9(b) of the Atomic Energy Act of 1946 (42 U.S.C.A. § 1809(b)). This provision was commonly referred to as "the activities clause". It expressly exempted from state, county or municipal taxation the AEC and its property, activities and income. While this provision was a part of the Atomic Energy Act, the United States Supreme Court, in 1952, decided the case of Carson v. Roane-Anderson, 342 U.S. 232, 72 S.Ct. 257, 96 L.Ed. 257, in which it was held that the State of Tennessee could not collect sales or use taxes from management contractors nor their direct suppliers on items of tangible personal property in the performance of atomic energy functions by reason of Section 9(b) of the Atomic Energy Act. Under the South Carolina Sales and Use Tax Act (Section 65-1421 of the 1952 South Carolina Code of Laws), the use tax is imposed upon the user, storer or consumer of tangible personal property purchased at retail, which, in this case, is du Pont. The decision in Carson v. Roane-Anderson, measured in the light of the aforementioned section of the South Carolina Use Tax Act, would preclude assessment and collection of use taxes during the period from the enactment of the South Carolina Sales and Use Tax Act in July, 1951, to October 1, 1953, that is to say during the existence of Section 9(b) of the Atomic Energy Act, "activities" being therein held to be broad enough to cover the use tax during that period.

As regards the sales tax during the aforementioned period, July 1, 1951, to October 1, 1953, the provisions of the South Carolina Sales Tax Act must be regarded as having been considered by the South Carolina Supreme Court in State ex rel. Roddey v. Byrnes, 219 S.C. 485, 66 S.E.2d 33, where the sales tax was held to be a tax on the privilege of selling at retail measured by the amount of business done. The Sales Tax Act, therefore, imposed the sales tax on the seller of the goods. The Sales Tax Act has other provisions not passed upon by the South Carolina Supreme Court that must be considered along with the above principle. One of these provisions, as contained in the South Carolina statute during the existence of Section 9(b) of the Atomic Energy Act, was Section 65–1407 of the 1952 South Carolina Code of Laws, which required the seller to add to the purchase price an amount sufficient to make the seller whole by reason of his liability and to pass the same on to the purchaser. Equally important, however, in relation to this aspect are the provisions of Section 65–1409 of the 1952 South Carolina Code of Laws which specifically provide that the provisions of Section 65–1407 of the 1952 South Carolina Code of Laws shall, in no wise, relieve the seller from the tax imposed by the statute either because of inability, impracticability, refusal or failure to add to the sales price and to collect same from the purchaser the amounts provided therein. Therefore, the South Carolina sales tax is one imposed on the seller and being such is not a tax on the "activity" of the AEC. Of course, for the period after March 20, 1954, when the South Carolina Legislature amended the Sales Tax Act so as to make the pass-on provisions permissive instead of mandatory, the plaintiffs are not contesting the liability for sales taxes thereafter, that is, after March 20, 1954 (Allegation 6 of the complaint). On the other hand, plaintiffs are contesting use taxes for the entire period.

One aspect of this case, injected by plaintiffs, has to do with the question of implied constitutional immunity from state taxation. Plaintiffs admitted, at the trial of this case, that except for alleged implied constitutional immunity the South Carolina Sales and Use Tax Act would be sufficient for the imposition and collection of those taxes. The plaintiffs contend that such doctrine extends to cover the purchases of tangible personal property by du Pont and the use of such items by du Pont. The defendants contend that such is not the case.

A review of the cases dealing with the implied constitutional immunity theory reflects that the subject has been treated as it relates specifically to the realm of sales and use taxes. The United States Supreme Court in State of Alabama v. King & Boozer, 314 U.S. 1, 62 S.Ct. 43, 86 L.Ed. 3, held that the application of the Alabama sales tax to sales of tangible personal property, made to a contractor with the United States, infringed no constitutional inhibitions against State taxation of the United States. In the companion case of Curry v. United States, 314 U.S. 14, 62 S.Ct. 48, 86 L.Ed. 9, the United States Supreme Court held the Alabama use tax to be constitutionally unobjectionable. In the later case of Kern-Limerick, Inc. v. Scurlock, 347 U.S. 110, 74 S.Ct. 403, 405, 98 L.Ed. 546, the United States Supreme Court found that the contractors there, under the express terms of the contracts, were purchasing agents for the government and differentiated the case of State of Alabama v. King & Boozer in that important and fundamental particular. A relevant part of the contract considered in Kern-Limerick, Inc. v. Scurlock reads: "The Contractor shall act as purchasing agent of the Government in effecting such procurement and the Government shall be directly liable to the vendors for the purchase price". Being expressly designated as agents of the government for the specific purpose of buying items of tangible personal property, the legal incidence of the tax fell directly upon the

United States, and thus infringed the government's constitutional immunity from taxation. In the case of State of Alabama v. King & Boozer, there was no expressed authority for the contractor to act as an agent of the United States, and the legal incidence of the taxes fell upon the contractor and not upon the United States. The same is true in Curry v. United States.

As has been shown hereinbefore du Pont has not been acting as an agent of the government, but on the contrary as an independent contractor in designing, constructing and operating the Savannah River Project.

In considering plaintiffs' claim that the doctrine of implied constitutional immunity from state taxation is applicable here, reference must be had to the contract to ascertain du Pont's status. It expressly made du Pont agent of the government for one purpose and one purpose alone, that is, for the purpose of leasing government owned houses, stores and other buildings. That was the very thing done in the contract between du Pont and the United States respecting the Hanford Project of the AEC, as shown in the case of E. I. Du Pont de Nemours & Co., Inc. v. State of Washington, 1954, 44 Wash.2d 339, 267 P.2d 667, where the Court held *du Pont to be an independent contractor and not an agent of the United States.* The United States intervened in that case but there was no appeal. Nothing could be clearer than that the contract did not create du Pont an agent to purchase tangible personal property for the government, although the minds of the contracting parties adverted to agency for the purpose of leasing government property for which du Pont was made an agent. Since the contract does not constitute du Pont an agent of the government for the purchase of tangible personal property, the principles laid down in Kern-Limerick v. Scurlock would not be met so as to provide tax immunity to du Pont. That decision by no means holds that agency is to be implied between the parties but rather that the contract to which the parties have agreed shall govern.

The principal items of taxation at issue in this case relate to use taxes, as most of the items of tangible personal property were purchased outside of South Carolina and were brought or caused to be brought into South Carolina for use, storage or consumption by du Pont. The South Carolina Use Tax Act imposes a tax in such circumstances. Section 65–1421 of the 1952 South Carolina Code of Laws; State ex rel. Roddey v. Byrnes, 219 S.C. 485, 66 S.E.2d 33.

The plaintiffs contend that du Pont is not liable for use taxes because title to most of the tangible personal property vested in the United States at points outside of South Carolina and was thereby insulated from state taxation. The defendants, on the other hand, rely on the provisions of the South Carolina Use Tax Act particularly the statutory definition of the word "use" and contend that du Pont is liable for the use taxes under a proper construction and application of the South Carolina statutes dealing therewith. Section 65–1367 of the South Carolina Code of Laws defines "use" in part as the "exercise of any right or power over tangible personal property incident to the ownership of that property". If the statute had stopped right there the position of the plaintiffs might have some merit. However, the statute does not stop there but rather it has another complete clause disjoined from the foregoing quoted portion by the word "or" reading, "or by any transaction in which possession is given". Thus, "possession" is made the key word. Here du Pont had possession of a large amount of tangible personal property, which it necessarily used in carrying out its obligations to the government, as prime contractor, on the Savannah River Project. Certainly the tangible personal property was used by du Pont, even though it was apart from ownership, precisely what the statute contemplates. The South Carolina statute is different in that particular from the Connecticut

and Kansas statutes which were considered in the cases of Avco Manufacturing Company v. Connelly, 19 Conn.Sup. 323, 113 A.2d 364, and General Motors Corporation v. State Commission of Revenue and Taxation, 182 Kan. 237, 320 P.2d 807. The holdings in those cases were predicated on the language of the use tax statutes involved.

The March 3, 1958, decisions of the United States Supreme Court in City of Detroit v. Murray Corporation of America, 355 U.S. 489, 78 S.Ct. 458, 2 L.Ed.2d 441, United States of America and Borg-Warner Corporation v. City of Detroit, 355 U.S. 466, 78 S.Ct. 474, 2 L.Ed.2d 424, and United States of America v. Township of Muskegon, 355 U.S. 484, 78 S.Ct. 483, 484, 2 L.Ed.2d 436, support the validity of the South Carolina use tax.

The last cited cases should settle the use tax issue once and for all. It is quite manifest from what is stated in those cases that our Supreme Court does not intend, by strained constitutional construction, to restore to the Atomic Energy Act what was deleted therefrom by the Congress of the United States pursuant to strong public demand that it do so. In the Borg-Warner case it was pointed out by Mr. Justice Black in the leading opinion that the Michigan statute challenged in that case imposed a tax on a private lessee and user of tax exempt property in the conduct of his own business. Further that the taxes imposed by the statute were personal obligations of the private user; that the owner was not liable for the payment of the tax nor was the property itself subject to a lien for the satisfaction of the tax, and that no attempt had been made to levy against the leased property belonging to the government. "Nevertheless", as Mr. Justice Black went on to say, "the Government argues that since the tax is measured by the value of the property used it should be treated as nothing but a contrivance to lay a tax on that property. We do not find this argument persuasive. A

tax for the beneficial use of property, as distinguished from a tax on the property itself, has long been a commonplace in this country. See Henneford v. Silas Mason Co., 300 U.S. 577, 582–583, 57 S.Ct. 524, 526–527, 81 L.Ed. 814." [355 U.S. 466, 78 S.Ct. 476.]

Obviously, the federal government may not impose federal taxes by contract, since the power to impose federal taxes is vested in the Congress of the United States, or impose state taxes by contract, since the power to impose state taxes is vested in the several States. For the same obvious and basic reasons, the federal government is without power to grant relief from federal or state taxes by the expediency of a contract with a private corporation, since the power to impose taxes necessarily includes the power to grant relief therefrom and that power as respects federal taxes is vested in the Congress and as respects state taxes is vested in the legislative bodies of the several States.

Therefore, whether du Pont may be relieved of state taxes in the performance of its contractual obligations in South Carolina for the government can by no stretch of the imagination be determined by a contract with the AEC in the absence of some valid statute exempting du Pont from such taxation, as by making du Pont an agent with power to bind the government.

Even assuming, without agreeing, that du Pont has rendered without charge services that are valuable to the government, and that the commendable character of the services merit relief from State taxes in the performance of those services it does not follow that the State of South Carolina should bear the sole burden of that relief. This is particularly true since the effect of such relief would not be for the benefit of du Pont, but solely for the government, in relieving it from its contractual obligation to reimburse du Pont for such taxes.

I would dismiss the complaint and enter judgment for the defendants.