UNITED AIRCRAFT CORPORATION *v.* DENNIS P. O'CONNOR, TAX COMMISSIONER

INGLIS, C. J., BALDWIN, O'SULLIVAN, WYNNE and DALY, JS.

Argued June 3—decided August 3, 1954

*Arthur L. Shipman, Jr.,* with whom, on the brief, was *Benjamin Hinman,* for the appellant (plaintiff).

*Walter T. Faulkner,* assistant attorney general, with whom, on the brief, was *William L. Beers,* attorney general, for the appellee (defendant).

O'SULLIVAN, J. In 1950, the defendant made a deficiency assessment against the plaintiff for sales and use taxes incurred from July 1, 1947, to March 31, 1948, inclusive. The deficiency was assessed upon the storage, use and consumption within the state of tangible personal property purchased by the plaintiff to carry out five contracts between itself and the United States of America. General Statutes, Sup. 1947, § 337i. Claiming to be aggrieved by the defendant's action, the plaintiff appealed to the Superior Court, which affirmed the tax deficiency and dismissed the appeal. Sup. 1947, § 344i. From that judgment the plaintiff has appealed to this court.

The finding, which is not subject to material correction, recites the following facts: The plaintiff is engaged at East Hartford in the production and sale of standard aircraft engines and parts. It also maintains a research engineering department. This department performed services for the United States navy and the United States army air corps under five contracts, referred to herein as A, C, G, H and I. To fulfil its contractual obligations, the plaintiff purchased, from July 1, 1947, to March 31, 1948, inclusive, tangible personal property at a cost of $1,328,913.53. The defendant had issued to the plaintiff a retail sales and use tax permit pursuant to § 331i (4) of the 1947 Supplement, and when the purchases were made, the plaintiff gave resale certificates therefor to the vendors. Sup. 1947, § 332i (1), (2), (4).[1] Since no sales or use tax was paid

---

[1] "Sec. 332i. PRESUMPTIONS AND RESALE CERTIFICATES. (1) PRESUMPTION OF TAXABILITY; RESALE CERTIFICATE. For the purpose of

on the purchases just mentioned, the defendant levied against the plaintiff a deficiency assessment amounting to $39,867.41.

Contract A required the plaintiff to furnish and deliver to the government eight experimental engines; contract C, to furnish and deliver one full-scale mockup, complete with mounts and other equipment, and three experimental engines; and contract I, to furnish and deliver four engines of a model to be developed by the plaintiff. Contracts G and H differed from the other three in that the government furnished engines for the plaintiff's use in experimentation. The services under contract G included the conversion of the engines into a type described as R-4360-41, which was then nonexistent, by the installation of new parts to the extent of about 15 per cent. Contract H required the plaintiff to convert three engines furnished by the government into new types by a change of approximately 25 per cent of the parts. Under contracts G and H, title to the furnished engines remained in the government. The

---

the proper administration of this chapter and to prevent evasion of the sales tax it shall be presumed that all gross receipts are subject to the tax until the contrary is established. The burden of proving that a sale of tangible personal property is not a sale at retail is upon the person who makes the sale unless he takes from the purchaser a certificate to the effect that the property is purchased for resale. (2) EFFECT OF CERTIFICATE. The certificate relieves the seller from the burden of proof only if taken in good faith from a person who is engaged in the business of selling tangible personal property . . . and who, at the time of purchasing the tangible personal property, intends to sell it in the regular course of business or is unable to ascertain at the time of purchase whether the property will be sold or will be used for some other purpose. . . . (4) LIABILITY OF PURCHASER. If a purchaser who gives a certificate makes any use of the property other than retention, demonstration or display while holding it for sale in the regular course of business, the use shall be deemed a retail sale by the purchaser as of the time the property is first used by him, and the cost of the property to him shall be deemed the gross receipts from such retail sale. . . ."

work required by the five contracts was completely performed by the plaintiff, and in each instance the engines which were the subject matter of the contract were delivered to the government and the payments called for by the contracts were made by the government.

Contracts A, C and H also provided for partial payments and that when such payments were made, "title to all parts, materials, inventories, work in process and non-durable tools theretofore acquired or produced" should vest in the government, but that "[u]pon liquidation of all partial payments . . . or upon completion of deliveries called for by this contract, title to all property (or the proceeds thereof) which has not been delivered to and accepted by the Government under this contract or which has not been incorporated in supplies delivered to and accepted by the Government under this contract and to which title has vested in the Government . . . shall vest in the Contractor."

The price for a regular production engine ranges from $30,000 to $70,000. The charge per engine under contract A was $187,000. The charge under contract C for three engines and the mock-up was $5,000,000. Under contract H, the plaintiff received $5,500,000 for reconverting three government-owned engines. Under contract I, the unit price per engine was $300,000. The expense of experimental work far exceeds that for production of standard engines and parts because materials and parts have to be purchased in greater volume in order to allow for failures and design changes on experimentation, and to avoid delays where time is of vital importance to the government.

The plaintiff's practice was not to purchase materials in anticipation of possible future contracts

but to make such purchases only for specific existing contracts. The materials purchased for a particular contract were segregated for use in performing that contract. Some were used in fabricating experimental engines or parts which the particular contract required, some were not used because of design changes and technological developments, some were found defective, and some became surplus over actual needs. Defective and obsolete material was discarded and sold as scrap. Surplus material, if found usable for some other experimental purpose, was so used by the plaintiff. The scrap resulting from the performance of a particular contract was sold, the money received was credited to the plaintiff's overhead expenses, and those expenses were applied to both experimental and regular production business.

All of the property purchased by the plaintiff for the five federal contracts was acquired upon the assumption that it was suitable for the particular work, and it was acquired in sufficient quantity to permit performance of the contract without interruption by reason of running short of material or the discovery of hidden defects, changes in engineering principles or design, alternative design and other conceivable eventualities. The plaintiff knew at the time of purchase that only a part of the materials would be incorporated in the final product. Materials which meet preliminary tests may be spoiled in the fabrication process or found to have hidden defects requiring that they be discarded. Where novel or difficult problems in design arise, the plaintiff must anticipate possible failure of one design upon testing and, in order to avoid delay, must make provision for one or more alternative designs by purchasing extra materials. Rapid advances in aircraft

engineering technology frequently cause the plaintiff to make design changes, and it is necessary to purchase materials in anticipation of incorporating such possible technological improvements, even though this means discarding other materials.

The plaintiff purchased and paid for all the materials used in performing the contracts. The materials and parts were received, owned, placed in stockrooms and used by the plaintiff in its plant at East Hartford, or they were delivered to subcontractors at the plaintiff's direction and subject to its ownership and control. It did not make any of the purchases as an agent of the United States government. All purchases were made by the plaintiff as an independent contractor for the performance of the experimental projects. There is no finding as to how much of the material bought by the plaintiff for $1,328,913.53 was used and scrapped and how much was eventually incorporated into the engines.

The Sales and Use Tax Act was adopted by the General Assembly in 1947. Sup. 1947, c. 78a. The sales tax, on the one hand, and the use tax, on the other, are distinct from each other. They are based on different conceptions and are assessments on different transactions, even though, in many instances, they bring about the same result. *Connecticut Light & Power Co.* v. *Walsh,* 134 Conn. 295, 300, 57 A.2d 128. Speaking generally, the sales tax is imposed upon transactions within the state, and the use tax upon articles bought in other states which, if bought in Connecticut, would be subject to the sales tax. Ibid. In the case at bar we need not make any distinction, since the finding does not disclose where the items of personalty were purchased. It will not affect the result if, as we propose to do, it is assumed that the purchases were all made within

the state. Our purpose shall be to determine whether the plaintiff was subject to a sales tax.

The 1947 act created a tax of 3 per cent upon all sales of tangible personal property sold at retail in this state. Sup. 1947, § 330i. A sale at retail was defined as a sale of tangible personal property for any purpose other than resale in the regular course of business. Sup. 1947, § 329i (3½). The act defined a sale as including various types of transactions, among which are those involving any transfer of title of tangible personal property for a consideration. Sup. 1947, § 329i (3)(a). This statutory definition controls the characterization of the transactions in the case at bar, regardless of whether a similar result would ensue upon the application of principles of common law. *Bradley Supply Co.* v. *Ames,* 359 Ill. 162, 169, 194 N.E. 272; *Kohn* v. *Philadelphia,* 151 Pa. Super. 635, 639, 30 A.2d 672. The subordinate facts clearly establish that the plaintiff's purchases of tangible personal property, at a cost of $1,328,913.53, were sales within the act. But whether they were sales at retail is another question.

The adverse claims of the parties sharpen the issue between them on this matter. The plaintiff maintains that the sales were not subject to a tax because they were purchased for resale. The defendant argues, on the other hand, that the sales are taxable because the personalty was not bought for resale but rather for experimental and research work to be performed under contracts primarily designed to obtain the technical skill of the plaintiff's engineering staff. We must turn, then, to the five contracts between the plaintiff and the federal government to determine whether they are contracts for services or contracts for sale of tangible personal property. The determinant is to be found in the intention of the parties to

those contracts. That intention is to be ascertained from the language used, interpreted in the light of the situation of the parties and the circumstances surrounding them. *Preston* v. *Verplex Co.,* 135 Conn. 187, 189, 62 A.2d 860; *Ives* v. *Willimantic,* 121 Conn. 408, 411, 185 A. 427. The following factors are significant: (1) The contracts, in describing the character of the work to be performed, frequently refer to it as "experimental." (2) The government reserved to itself the right to make changes in the drawings and specifications at any time during the experimental manufacture. (3) The plaintiff agreed to deliver to the government not only engines but also assembly specifications, blueprints of original experimental drawings, test reports, monthly progress reports, and descriptions of the design and construction of all new parts. (4) The government acquired the right to practice inventions arising out of the experimental services and to use the technical information delivered to it under the contracts. None of these factors would normally be the subject of agreement in a contract merely to manufacture and sell a specific article.

Nor can we overlook the fact that the federal government is constantly searching, in these troubled times, for the improvement of engines in order to attain performance in the air at least comparable to that of friendly or hostile countries. This policy requires continual vigilance and the use of the best inventive powers of our people. There can be no doubt that, in entering into the five contracts, the government was pursuing this policy. It was looking for designs for engines better than any then existing. It sought to attain that end by utilizing the skill of the research and engineering department of the plaintiff's plant.

Viewed in their broadest aspect, the contracts were clearly for the rendition of skilled engineering services, and the delivery of items of tangible personal property, fabricated into engines, was, at most, only incidental to the services rendered. The delivery of such property is not a sale at retail under the act if it is merely incidental to a special service performed for the purchaser. *Snite* v. *Department of Revenue,* 398 Ill. 41, 45, 74 N.E.2d 877; note, 139 A.L.R. 372, 381; 47 Am. Jur. 231, § 26. It necessarily follows that the contracts were for services and that the plaintiff is liable for a sales tax on its purchases of $1,328,913.53. The court was correct in dismissing the plaintiff's appeal from the assessment made by the defendant.

There is no error.

In this opinion the other judges concurred.