UNITED AIRCRAFT CORPORATION *v.* WILLIAM F. CONNELLY, TAX COMMISSIONER

WYNNE, C. J., DALY, MURPHY, COTTER and MACDONALD, Js.

Argued November 7, 1957—decided March 25, 1958

*Walter T. Faulkner,* assistant attorney general, with whom were *F. Michael Ahern,* assistant attorney general, and, on the brief, *John J. Bracken,* attorney general, for the appellant-appellee (defendant).

*Cyril Coleman,* with whom was *C. Duane Blinn,* for the appellant-appellee (plaintiff).

*H. Eugene Heine, Jr.,* of the Pennsylvania bar, with whom, on the brief, were *John N. Stull,* of the New York and Pennsylvania bars, acting assistant attorney general of the United States, *Simon S. Cohen,* United States attorney, *Henry C. Stone,* assistant United States attorney, and *A. F. Prescott,* of the Maryland bar, as amicus curiae.

MacDonald, J.   Four appeals, which have been consolidated for the purposes of appeal to this court, were originally brought by the plaintiff from the assessment against it by the defendant of various tax deficiencies under the provisions of the Sales and Use Tax Act.  General Statutes, c. 104, §§ 2090-2115, as amended.  The deficiencies were assessed, in three of the cases, on activities of the plaintiff during the period April 1, 1948, to December 31, 1952, and in the fourth case on activities during the first quarter of 1954.  Except in one case, where the taxes in dispute are unpaid, all of the taxes in issue, together with interest thereon, were paid by the plaintiff on receipt of the defendant's deficiency assessments, and the plaintiff's claims for refunds were denied by defendant.

The taxes in issue relate to the plaintiff's business as an aeronautical manufacturer, carried on through numerous corporate divisions, and the tax assessments were actually directed to one or another of these divisions, each of which, with one exception, held, throughout the periods covered by the assessments, a retail sales and use tax permit issued to it by the defendant pursuant to § 2093 of the General Statutes.   Of the more than one million dollars in taxes originally in issue, $702,012.53 remains directly or indirectly in controversy on the defendant's appeal, and an additional $22,844 is in controversy on

the plaintiff's cross appeal, so that the total amount remaining in controversy is $724,856.53, together with statutory interest as applicable.

It has been stipulated by the parties that all of the property the taxes as to which are in issue may be considered to have been purchased in Connecticut, and that the plaintiff gave each vendor from whom such property was purchased a certificate to the effect that the property was purchased for resale. All of the taxes were assessed on account of what the defendant asserts is a taxable use, by the plaintiff, of the tangible personal property thus purchased by it, no tax having been assessed on account of any sales of such property by the plaintiff, nor for receiving, fabricating or installing what is described in the finding as the "severable facilities." The taxes remaining in issue were assessed on account of the plaintiff's purported use of tangible personal property falling within one or another of the following categories: (1) Property such as machine tools and office equipment, acquired pursuant to three so-called facilities contracts between the plaintiff and the government of the United States; (2) property such as fabrication materials, employed by the plaintiff in fulfilling certain so-called experimental contracts between it and the government; (3) miscellaneous materials such as x-ray film and chemicals, used by the plaintiff in its ordinary manufacturing operations. In the interests of clarity, these three categories of tangible personal property will be considered separately.

I. PROPERTY ACQUIRED PURSUANT TO FACILITIES CONTRACTS.

The plaintiff had three facilities contracts with the government, each of which contemplated that the plaintiff would, without charge for its services,

handle most of the mechanics of buying such new facilities as might be required. Two of the contracts provided that title to the facilities would automatically pass to, and vest in, the government upon delivery to the contractor at the contractor's plant, and the remaining contract provided that title would pass to, and vest in, the government "upon delivery to the Contractor, or upon the happening of any earlier event by which title passes from the Contractor's vendor or supplier." Prior to any purchase, the plaintiff was required to, and did, obtain government approval, and immediately upon arrival at the plaintiff's plant every facility item was identified by a permanent metal tag as government owned. Following arrival at the plaintiff's plant, the facilities were inspected jointly by representatives of the plaintiff and the government, and the plaintiff's use of the facilities thereafter was under constant government supervision. The purchase price of each facility was paid initially by the plaintiff, which was reimbursed by the government.

Many of the details pertaining to the ordering, purchasing, inspection and supervision of the facilities were quite similar to those described in the lengthy summary of facts given in our opinion in *Avco Mfg. Corporation* v. *Connelly,* decided this day. Consequently, much of what we said in that case is applicable in reaching the conclusion here—at least with respect to all the items under one contract and the items listed in the other two contracts which were purchased from vendors on an f.o.b. destination point basis—that the party to whom title directly passed was the government of the United States. With respect to these items, the principal factual difference between the two cases is that in the *Avco* case the title clause in the facilities contracts pro-

vided that title should pass to the government simply "upon delivery of such property by the vendor," and since all purchase orders involved there provided for shipment f.o.b. the vendor's plant, the vendor transferred title at the moment of delivery to the carrier, while here, as pointed out above, one contract provided that title should pass to the government upon delivery to the contractor, and the other two, upon delivery to the contractor at the contractor's plant. Upon these conditions, the trial court held not taxable all items in the first contract and such items in the other two as were purchased from vendors on an f.o.b. destination point basis, ruling, in effect, that the instant at which the vendor transferred title was the instant at which, under the contracts, title was to vest in the government, and that any ownership by the plaintiff could have endured only for a theoretical instant of time, during which the plaintiff had no opportunity to, and in fact of course did not, make any "use" of the facilities within the meaning of § 2094 (4) of the General Statutes[2] and was not taxable thereunder.

On the other hand, with respect to the items which, under two of the contracts, were purchased on an f.o.b. shipping point basis, the court sustained the assessment of the taxes, and this holding forms the subject matter of the plaintiff's cross appeal. In reaching this result, the court found that title was in the plaintiff during transportation, that therefore

---

[2] "Sec. 2094. PRESUMPTIONS AND RESALE CERTIFICATES. . . . (4) LIABILITY OF PURCHASER. If a purchaser who gives a [resale] certificate makes any use of the property other than retention, demonstration or display while holding it for sale in the regular course of business, the use shall be deemed a retail sale by the purchaser as of the time the property is first used by him, and the cost of the property to him shall be deemed the gross receipts from such retail sale. . . ."

the plaintiff was the owner for more than a theoretical instant of time, and that the plaintiff made a taxable "use" during the period of transportation by retaining ownership of the facilities with all of the rights, powers and privileges incident thereto. Even this very brief and limited "use" is sufficient, under the definition of that word in § 2091 (6) as "the exercise of any right or power over tangible personal property incident to the ownership of that property," to justify imposition of the tax with respect to these transactions.

The action of the trial court, with respect to property acquired under the facilities contracts, in setting aside the assessment of $2278.08, plus interest, under the first contract, the assessment of $571,510.11 under the second contract, and the assessment of $11,912.93 under the third contract, and in affirming the assessment of $22,844 attributable to the facilities involved in plaintiff's cross appeal—being those purchased on an f.o.b. shipping point basis—is entirely in accord with our decision in the *Avco* case, supra, for the reasons stated therein, and under the authorities therein cited, notably *Illinois Central R. Co.* v. *United States*, 265 U.S. 209, 44 S. Ct. 485, 68 L. Ed. 983; *Kern-Limerick, Inc.* v. *Scurlock*, 347 U.S. 110, 74 S. Ct. 403, 98 L. Ed. 546; *United States* v. *Allegheny County*, 322 U.S. 174, 64 S. Ct. 908, 88 L. Ed. 1209; and *General Motors Corporation* v. *State Commission of Revenue & Taxation*, 182 Kan. 237, 320 P.2d 807.

## II. PROPERTY ACQUIRED PURSUANT TO EXPERIMENTAL CONTRACTS.

The plaintiff had a number of so-called experimental contracts with the government under which it was required to manufacture, deliver and sell to the government certain articles of tangible personal

property, more specifically aeronautical equipment such as airplanes, aircraft engines and propellers. The taxes involved in connection with these contracts were assessed by the defendant on account of the plaintiff's use of various fabrication materials acquired by it for the manufacture of the articles, which, in all but one instance, were sold to the government. It was stipulated by the parties that within the meaning of the Sales and Use Tax Act these were "materials," and that no "use" of them was made by the plaintiff apart from what was done with them in the performance of the experimental contracts, and that they were purchased by the plaintiff for the purpose of fulfilling its commitments under those contracts. The fabrication materials fell into three main categories: (1) Raw materials used in the manufacture of finished component parts to be incorporated into the end product sold to the government; (2) component parts purchased in a finished state to be incorporated in the end product; and (3) tooling such as jigs, dies and fixtures which, although not incorporated in the end product, were consumed and used up in the process of manufacture or were of no use thereafter and, accordingly, became expendable and practically worthless. All of these fabrication materials either became a component part of the end products delivered under the experimental contracts or were consumed in their manufacture, and the primary, if not the only real, objective of the government, as well as of other parties involved, in entering into these contracts was the procurement of the airplanes, engines, propellors or other articles of tangible personal property called for thereunder.

Stated briefly, the problem presented as to the experimental contracts concerns the taxable status, un-

der our Sales and Use Tax Act, of the plaintiff's use of raw materials in manufacturing products for sale. The trial court held the plaintiff's use of the materials to be not subject to tax, and we concur in that conclusion. Upon the facts found, which, despite the defendant's wholesale attack, appear to be entirely supported by the evidence, the transactions in question are clearly exempt from tax under the provisions of the act itself. Section 2096 (r), the provisions of which first went into effect in 1948 (Public Acts, Spec. Sess., Feb., 1948, No. 1, § 7), before the occurrence of any of the transactions involved here, granted specific exemption to "[s]ales of and the . . . use . . . of materials, tools and fuel or any substitute therefor . . . which became an ingredient or component part of tangible personal property to be sold or which are consumed and used directly . . . in an industrial plant in the process of the manufacture of tangible personal property to be sold."

Since we consider this statutory exemption specifically applicable, it is necessary to discuss only briefly our decision in *United Aircraft Corporation* v. *O'Connor,* 141 Conn. 530, 107 A.2d 398, cited by the defendant in support of his contention that the furnishing of the end products called for by the experimental contracts was merely incidental to the furnishing of personal services. There we held, in effect, that where a contract called "clearly for the rendition of skilled engineering services, and the delivery of items of tangible personal property, fabricated into engines, was, at most, only incidental to the services rendered, [t]he delivery of such property is not a sale at retail under the act if it is merely incidental to a special service performed for the purchaser." Id., 539. In that case, the contractor failed to establish that its purchases were for "sale" to the govern-

ment within the statutory definition (§ 2091 [3]), because the intention of the parties, as expressed in the contracts and found from the circumstances there involved, was that the delivery of the end products was merely incidental to the real objective of procuring the contractor's skilled engineering services. Since the furnishing of the end products to the government was not by way of sale, we held that there was no "resale" to the government. This holding, in turn, precluded the contractor's purchases from its vendors from being for "resale in the regular course of business," the result being that the sales to the contractor were taxable "sales at retail" within the statutory definition. § 2091 (4). The findings in the instant case clearly support the conclusion that the products of the so-called experimentation were the tangible personal property delivered to the government and were the end and primary objective of the government.

It follows that under the rule of the *O'Connor* case, supra, as well as under the provisions of § 2096 (r) and its successor statute (Cum. Sup. 1955, § 1167d), the plaintiff's purchases of personal property for use in carrying out the experimental contracts were properly exempted from taxation.

III. MISCELLANEOUS MATERIALS USED IN ORDINARY MANUFACTURING OPERATIONS.

The taxes with respect to personal property falling within this third category include amounts assessed on account of the plaintiff's use of production materials such as x-ray films, testing chemicals, oil and gasoline in its manufacture, in assembly-line production, of aircraft engines and helicopters for sale. It was stipulated by the parties that except for what is termed "Sikorsky Oil and Gas," all these materials constituted "materials"

within the meaning of § 2096 (r) and that, within the meaning of § 2094 (4), the plaintiff made no use of the materials except in the process of the manufacture in an industrial plant of tangible personal property for sale. The defendant has argued that the purchases of these materials were not exempt from taxes under § 2096 (r), on the ground that they were not consumed and used "directly" in the manufacture of property to be sold, but the trial court rejected this argument and concluded that all of the materials in question were consumed and used "directly" in such manufacture and that the plaintiff's use of them was exempt from taxation under § 2096 (r). We are in accord with this conclusion.

The defendant's claims on this point ignore the realities of present day industrial practice, and if the legislature had intended to limit the application of § 2096 (r) to materials consumed in actual fabrication of the finished product, it probably would have used a term less broad than "the process of the manufacture"—possibly by eliminating the word "process" entirely. The inclusion of the word "process" would appear to indicate an intention to include any use made of property as a necessary preliminary to the delivery of the finished product. X-ray films and laboratory chemicals were consumed in testing the metal parts, and oil and gas were used to test motors before their delivery. Such uses must be deemed a part of the manufacturing process. The defendant's argument is somewhat weakened by the regulations issued by his own department. These list, as examples of materials whose use is indirect and not exempt, such articles as desks, light bulbs and clocks, while chemicals are cited as examples of exempt materials. Conn. Dept. Regs. § 104-5 (3), (6). A claim somewhat similar to that of the defendant that

some of the materials did not come into "direct contact" with the finished product was rejected by the Supreme Judicial Court of Maine in *Hudson Pulp & Paper Corporation* v. *Johnson,* 147 Me. 444, 88 A.2d 154.

The court in its memorandum of decision listed and explained with meticulous care the many separate contracts, regulations and procedures involved in this rather complex situation, and its action in setting aside all the assessments except those involved in the plaintiff's cross appeal was correct.

There is no error.

In this opinion the other judges concurred.