COMPTROLLER OF THE TREASURY, ETC. *v.*
FAIRCHILD ENGINE AND AIRPLANE
CORPORATION

[No. 98, September Term, 1961.]

*Decided December 20, 1961.*

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT, HORNEY and MARBURY, JJ.

*William J. McCarthy, Assistant Attorney General,* and *Edward F. Engelbert, Retail Sales Tax Division,* with whom was *Thomas B. Finan, Attorney General,* on the brief, for appellant.

*David W. Byron* and *Kenneth J. Mackley,* with whom were *Lane, Bushong & Byron* on the brief, for appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from an order of court reversing a decision of the Comptroller and entering a judgment against the Comptroller in the amount of $49,486.40, representing a refund of sales and use taxes previously paid by Fairchild. The facts are virtually undisputed.

On July 1, 1954, Fairchild entered into a "study" contract with the United States Air Force, to determine whether it was feasible, from a technical point of view, to build a certain type of missile and use it as a decoy to confuse enemy radar by simulating an attack plane, the B-52. This project was completed in the spring of 1955. Thereafter, Fairchild submitted various proposals showing manufacturing details

and estimated costs. On September 21, 1955, an elaborate contract was executed of the cost plus a fixed fee type. This was called the "goose" contract, from the name of the missile. The initial appropriation was $3,550,000.00, with the total cost estimated at some $14,000,000.00. Fairchild was given complete design responsibility, as the prime contractor. Most of the work was to be performed at Hagerstown, Maryland, the assembly point.

The contract was described as a "Research and Development Program for Weapon System 123 A." Among other things, the contractor agreed to "perform the following services:

Item 1—Conduct a research and development program which will result in the development to completion of a weapon system in accordance with MCPHMS Document, dated 16 June 1955, * * * to include * * * the following:

(a) Provide a full-scale mock-up of the operational weapon system and participate in a mock-up inspection by the Air Force.

(b) Design and manufacture hardware for use in the research and development program, including a quantity of experimental missiles. The configurations and quantity of the hardware (missiles, ground equipment, etc.,) will be such that they are suitable for use in the flight program established by the Contractor. * * *.

(c) Conduct flight test program to demonstrate compliance of the aircraft requirements in respect to range, performance accuracy, and, to a limited extent, simulation. The flight test program will include demonstration of the weapon system ground equipment and launching techniques, * * *.

(d) Provide all the facilities, supplies and services necessary to accomplish Item 1, except for those provided by the Government * * *, including the repair and revision of experimental hardware in order to make tests and retests within the development pro-

gram. Also to be included are the parts and material required for these purposes. The costs incurred by the Contractor in providing such facilities shall be treated as direct costs allocable to the contract * * *."

There followed other provisions in regard to engineering reports and plans.

Part VI contained a clause: "Inspection and acceptance of physical articles fabricated under paragraph (b) of Item 1 will be at Hagerstown, Maryland." Fairchild's project engineer testified that the contract called for not less than fifty-three missiles to be built and flown, the last fourteen to be used for demonstration to the Strategic Air Command. Fairchild set up the operation by subcontracting for the wings and forward fuselage according to its own designs, and subcontracting for the engines and telemetry system. It constructed the vital center section and the after fuselage. Fairchild purchased raw materials and parts from various suppliers on an "F.O.B. vendor's plant" basis. Title passed to the Government, in accordance with the terms of the "goose" contract, upon delivery to Fairchild at the shipping points of origin, and the Government promptly paid the invoices. Some of the material, such as radio sets and guidance equipment, was supplied by the Air Force and built into the missiles.

The contract was terminated in December, 1958, because of a shift in Air Force strategic policy. At that time twenty-two of the fifty-three missiles called for in the contract had been built and fifteen had been fired in test flights. None of those fired was ever recovered. The information gained from the test flights, conducted at the Air Force Base at Cape Canaveral, Florida, by employees of Fairchild under Air Force Supervision, was used to improve or modify succeeding missiles. At the time of termination the tests had been successful and fully supported the predictions of the earlier study contract. Fairchild expected to receive a large production contract. The unexpended missiles and the ground equipment remained in the possession of, or were delivered to, the Air Force.

The taxes for which refund was claimed, except for a small

item paid by local suppliers, were paid by Fairchild by way of its own use returns, in conformity with a ruling of the Comptroller given in 1956. They were calculated upon the cost or value of materials actually incorporated into the "goose" missiles, and did not include tools, tooling raw material, machinery and equipment, or overhead items such as office supplies.

Code (1957), Art. 81, sec. 372 (d) provides:

"(d) *'Use'* means the exercise by any person within this State of any right or power over tangible personal property purchased either within or without this State * * *. This term shall also include but not be limited to use of facilities, tools, tooling, machinery or equipment (including, but not limited to dies, molds and patterns) by a purchaser thereof even though he transfers title to another either before or after use by him and without regard to whether title is transferred to the other within or without this State. This term shall not include the following: * * *

(2) The incorporation of tangible personal property as a material or part of other tangible personal property to be produced for sale by manufacturing, assembling, processing or refining."

Almost identical language is used in Code (1957), Art. 81, sec. 324 (f) in regard to sales at retail, and we shall treat the two together. The taxes are, of course, complementary. *Comptroller v. Glenn L. Martin Co.*, 216 Md. 235, 242.

The Comptroller concedes in his brief that if the "goose" contract is a contract for the production and sale, or use, of tangible personal property manufactured from the items purchased, rather than a contract for services, Fairchild is entitled to the refund it claims. It is the intent and purpose of the sales and use tax acts "To impose the tax on the final purchaser or ultimate consumer and to avoid a pyramiding of the tax." *Comptroller v. Aerial Products,* 210 Md. 627, 644. He contends, however, that the contract was for engineering services and that Fairchild itself was the ultimate consumer

and user of the articles purchased. But we agree with the trial court that this contract differs from the ordinary research and development contract in that under the delivery section it specifically provided for inspection and acceptance by the Air Force of each completed missile, to be followed by the test firing in Florida. Perhaps it could fairly be said that the contract was something of a hybrid, but we think the end result contemplated was a series of completed missiles with optimum flight characteristics, and not the usual engineering reports and data only, characteristic of a "study" contract, in the course of which items of tangible personal property are consumed. It may also be observed that a large proportion of the total cost was represented in the finished missile and ground equipment utilized in its launching and tracking. To the extent that the contract called for what is referred to as "hardware", the materials incorporated therein would seem to fall squarely within the exclusionary language of sec. 372 (d) (2), quoted above. It can hardly be denied that the completed missiles and the ground equipment were delivered to the Air Force and fully paid for by the Government. We think the fact that some of the missiles were expended, by way of test firing, is not controlling.

The Comptroller relies strongly upon the case of *United Aircraft Corp. v. O'Connor,* 107 A. 2d 398 (Conn.). In that case contracts for experimental engines were held to be for services, on the ground that the delivery of property was merely incidental to a special service performed by the purchaser. There was no finding as to how much of the material bought by the contractor was used and scrapped and how much was eventually incorporated into the engines. At the time of the transactions giving rise to the tax, the Connecticut statute did not contain the language subsequently enacted, excluding materials which become an ingredient or component part of tangible personal property to be sold. The soundness of the decision has been questioned in an article by *Hellerstein,* in 11 Tax L. Rev. 261, 283. We have distinguished it in two prior decisions. *Balto. Foundry v. Comptroller,* 211 Md. 316, 321; *Comptroller v. Aerial Products, supra.* In the later case of *United Aircraft Corp. v. Connelly,* 140 A. 2d

486, 491 (Conn.), the statutory exemption was applied, in the case of an experimental contract for aeronautical equipment such as airplanes, aircraft engines and propellers, and it was held that fabrication materials were not taxable, under the statutory exception. The court stated that even under the test of the *O'Connor* case, the products of the experimentation were the tangible personal property delivered to the Government and "were the end and primary objective of the government."

Since we hold that the items of material here in question were not subject to the sales or use tax, we do not reach the contention of the appellee that, since title passed to the Government upon delivery of each item, the doctrine of immunity applies. The appellant contends that the amendment of sec. 372 (d), and sec. 324 (f) (6), by chapter 3 of the Acts of 1957, imposed a tax upon "facilities", even though the contractor transferred title to another before or after use by him. Even assuming that the passage of title to the Government would not prevent the imposition of a tax based on the subsequent use made by the contractor (see *Martin Co. v. State Tax Comm.*, 225 Md. 404, 415-417), the Maryland statute clearly imports that where materials are incorporated in a manufactured or assembled product, the tax should be paid by the ultimate consumer. In the absence of Congressional consent, such a tax cannot be levied against the Government itself. It could hardly be contended that the nature and theory of the tax is altered by the fact that the ultimate consumer is immune. Nor do we find any reason to extend the term "facilities" beyond its context, where it is associated with "tools, tooling, machinery or equipment (including, but not limited to dies, molds and patterns)", so as to nullify the express provision excepting tangible personal property purchased for incorporation "as a material or part of other tangible personal property to be produced for sale by manufacturing, [or] assembling, * * *." As we pointed out in *Balto. Foundry v. Comptroller*, 211 Md. 316, 319, we are not here dealing with an exemption, but with a definition of the scope of the taxing statute. As we construe the "goose" contract, the Government,

and not the contractor, was the ultimate consumer of the missiles delivered and accepted, along with the appurtenant ground equipment, into which the property, now sought to be taxed, was incorporated.

The appellee complains that the trial court disallowed interest upon its claim, but in the absence of a cross-appeal we think the point is not properly before us. Cf. *Fitch v. Double "U" Sales Corp.*, 212 Md. 324, 329, and cases cited.

*Judgment affirmed, with costs.*

HORNEY, J., filed the following dissenting opinion.

The majority, in holding that the government, and not the contractor, was the ultimate consumer of those "experimental missiles" which had been made and tested by the contractor before the contract was abruptly terminated and abandoned by the government, based their conclusion on the belief that the real purpose of the contract was to produce "a series of completed missiles with optimum flight characteristics." I disagree because it is my belief that the contract, instead of being "something of a hybrid," was clearly one for the *performance of services* (according to the explicit terms of the contract itself) in conducting "a research and development program which will result in the development to completion of a weapon system," including (but not limited to) the design and manufacture of full-sized structural models of experimental missiles for study and testing. But mass production was not contemplated until a model had been finally accepted by the government.

As I read the contract, the transfer from Hagerstown to Cape Canaveral of fifteen of the model missiles that had been inspected and accepted by the government from time to time to be flight tested at a "full-scale mock-up of the operational weapon system," in which Fairchild was required to participate under the scrutiny of the Air Force, was nothing more than a phase of the whole experiment program to develop a model of a missile acceptable to the government. In fact, the only purpose of the flight testings was to obtain such informa-

tion as to performance as might be useful in perfecting later models of the missiles.

Under the cost-plus contract, it is a fact, of course, that title to the expendable model missiles was in the government, but in reality the cost of the models was only a part of the total contract price. And while the flight testing of the models was an integral part of the contract, it is apparent that the making of the models was merely incidental to the completion of the experimental contract.

In *United Aircraft Corp. v. O'Connor,* 107 A. 2d 398 (Conn. 1954), where the Supreme Court of Connecticut had before it contracts to render experimental engineering services, similar to the one we have here, the Court there declared (at p. 402) that "[v]iewed in their broadest aspect, the contracts were clearly for the rendition of skilled engineering services, and the delivery of items of tangible personal property, fabricated into engines, was, at most, only incidental to the services rendered, [and the] delivery of such property is not a sale at retail under the act if it is merely incidental to a special service performed for the purchaser." And, while it is true that the same Court in *United Aircraft Corp. v. Connelly,* 140 A. 2d 486 (Conn. 1958), under a substantially different factual situation from that in the *O'Connor* case, stated (at p. 491) that "the products of the so-called experimentation [in the *Connelly* case] were the tangible personal property delivered to the government and were the end and primary objective of the government," the Court, nevertheless, specifically affirmed the taxability of materials to the user when the furnishing of the end product called for by the contract for experimental services was merely incidental to the furnishing of such services.

It is also significant to note that Professor Jerome R. Helerstein—in the article entitled "The Scope of the Taxable Sale Under Sales and Use Tax Acts; Sales as Distinguished from Services," 11 Tax. L. Rev. 261, 283—in stating that the holding in the *O'Connor* case "appears open to question" unless the service classification is applied to special order contracts generally, definitely did not condemn the holding, and, on the contrary, admitted that the reasoning of the Court had

262

"a .persuasive appeal." Furthermore, it appears that a prior opinion of the Attorney General of Maryland is also in point. See 35 G. A. G. 285, where Judge Hammond (who was then the Attorney General) in an opinion concerning the status of a contractor performing services under an "experimental contract, containing the usual "title-in-government" clause, stated (at p. 287) that the contractor was "in reality (certainly as to most of the materials purchased), and within the purpose of the contract, the ultimate consumer."

In the instant case, where the only contractural requirement as to delivery was that the contractor should "complete the [stated experimental] work and deliver the data called for" by a specified date, I am unable to agree that the government was the ultimate consumer of the experimental missiles when there is nothing in the contract *requiring* delivery of such missiles to the government either at the time the flight tests were mocked-up or when the contract was completed by the contractor or was sooner terminated or abandoned by the government.

I would reverse the judgment of the lower court and reinstate the ruling of the Comptroller disallowing the claim for refund.