COLUMBIA PICTURES INDUSTRIES, INC., ET AL. *v.* TAX COMMISSIONER OF THE STATE OF CONNECTICUT

COTTER, C. J., LOISELLE, BOGDANSKI, LONGO and PETERS, Js.

Argued November 7, 1978—decision released February 13, 1979

*Richard K. Greenberg,* assistant attorney general, with whom were *Robert Klein,* assistant attorney

general, and, on the brief, *Carl R. Ajello,* attorney general, and *Ralph G. Murphy,* assistant attorney general, for the appellant (defendant).

*John H. Weir,* with whom were *Robert N. Schmalz* and *Herman M. Levy,* for the appellees (plaintiffs).

LOISELLE, J. The plaintiffs appealed from the payment under protest of a sales tax imposed on the rental of a film from the plaintiff distributor to the plaintiff motion picture exhibitor. The trial court sustained the appeal and from the judgment the defendant state tax commissioner has appealed.

The parties are in accord on the facts and have stipulated substantially as follows: The plaintiff Columbia Pictures Industries, Inc., hereinafter designated as Columbia, distributes motion pictures owned by producers whose ownership and benefit to be thereby derived are protected by copyright. On or about January 14, 1976, the plaintiff Columbia licensed a motion picture entitled "Hard Times" to the plaintiff Samuel R. Hadelman, doing business as Cheshire Cinema in the town of Cheshire. The producer of "Hard Times" had licensed Columbia to grant to exhibitors the right to possess and exhibit it. In the ordinary transaction, the distributor grants such rights in a motion picture to the exhibitor for a definite time and for a definite number of showings, after which the film print is returned to the distributor. In the present case, the film was shown at Cheshire Cinema from January 14, 1976, through January 20, 1976.

To make a movie, images are imprinted on the film print which is a roll of acetate or polyester material. Through the use of moving picture machinery, this print projects or reproduces the

picture, together with sound effects, upon a screen. The actual cost of the film print material for one print of "Hard Times" was $595. The production cost for the film was approximately $3,500,000, which consisted primarily of payment for the personal services of actors, directors, composers, musicians, authors, cameramen and other technicians. The value or cost of the actual film bears little or no relation at all to the payments contracted for pursuant to the agreement between the exhibitor and the distributor. The payments are based upon the number of persons expected to view the motion picture.

Pursuant to General Statutes § 12-407 (2) " 'Sale' and 'selling' mean and include . . . (k) the leasing or rental of tangible personal property of any kind whatsoever, including but not limited to motor vehicles, linen or towels, machinery or apparatus, office equipment and data processing equipment." The term "tangible personal property" is defined in § 12-407 (13) as "personal property which may be seen, weighed, measured, felt or touched or which is in any other manner perceptible to the senses." By virtue of these statutes, the defendant imposed a sales and use tax on the rental of films.

Hadelman paid the tax imposed by virtue of General Statutes § 12-408 to Columbia under protest. Columbia in turn filed its Sales and Use Tax Return for the quarter ended March 31, 1976, and paid under protest the tax collected from Hadelman. Later a claim was filed for a refund of this tax. After a hearing before the deputy tax commissioner, the request for the refund was denied. The trial court sustained the appeal and the defendant has appealed to this court.

The plaintiffs claim that their agreement is a license. The defendant, however, claims the agreement is a lease or rental. The issues presented by this appeal are: (1) does the license agreement[1] constitute a "leasing or rental of tangible personal property" within the statute and, (2) if the transaction does constitute a leasing or rental of tangible personal property within the statute, is the transaction exempt under General Statutes § 12-412 (k) which exempts from the sales and use tax "professional . . . or personal service transactions . . . which involve sales as inconsequential elements for which no separate charges are made."

The plaintiffs' argument is that the ownership of the copyright of the film is distinct and separate from the ownership of the film and that the license agreement is a license to exhibit publicly what is on the film and, therefore, is the transfer of an intangible right for a limited period of time and not a leasing or rental of tangible personal property under the provisions of General Statutes § 12-407 (2) (k).

The agreement between the two plaintiffs is entitled "License Agreement" and is in the form of a license. In determining what the transaction is, the character of the agreement rather than the phrasing of the contract involved is examined. *Community Telecasting Service* v. *Johnson*, 220 A.2d 500 (Me. 1966); *Kistner* v. *Iowa State Board of Assessment*

---

[1] "1. LICENSE: Exhibitor is granted and accepts a limited license under the copyright of the motion picture or pictures designated in the Schedule (herein individually and collectively called 'the picture') to exhibit the picture publicly by use of the print furnished by Distributor, without cuts or alterations of any kind, without any intermission unless otherwise provided, and only at the theatre, and only on the consecutive days specified in the Schedule or otherwise determined as provided herein (which consecutive days are herein called the 'license period'), and for no other purposes."

& Review, 225 Iowa 404, 280 N.W. 587 (1938); 68 Am. Jur., Sales and Use Taxes § 76. It is true, as claimed by the plaintiffs, that a copyright may be an incorporeal right to publish and does exist detached from the personal property out of which it arises. 18 Am. Jur. 2d, Copyright and Literary Property § 18. The agreement in the present case does not involve a transfer of the copyright itself unrelated to the film but is the leasing of the film in its finished state. *Boswell* v. *Paramount Television Sales, Inc.*, 291 Ala. 490, 493–94, 282 So. 2d 892 (1973). The plaintiffs agree that the possession of the film was transferred to the exhibitor but contend that the agreement was for a limited license to reproduce the performance of the actors. They claim that possession was transferred so that the exhibitor could exercise that right and that without the right to reproduce the value of the film was inconsequential. See *Washington Times-Herald, Inc.* v. *District of Columbia*, 213 F.2d 23 (D.C. Cir. 1954); *Watson Industries, Inc.* v. *Shaw*, 235 N.C. 203, 69 S.E.2d 505 (1952).

Further, the plaintiffs urge that the licensing of "Hard Times" by Columbia to Hadelman was exempt under General Statutes § 12-412 (k) because the agreement was a service contract and the film was at most only incidental to the service rendered. See the transactions discussed in *International Business Machines Corporation* v. *Brown*, 167 Conn. 123, 355 A.2d 236 (1974), *United Aircraft Corporation* v. *Connelly*, 145 Conn. 176, 140 A.2d 486 (1958), and *United Aircraft Corporation* v. *O'Connor*, 141 Conn. 530, 107 A.2d 398 (1954). Therefore, the transfer of possession of the film itself to the exhibitor was inconsequential and not taxable as a lease of tangible property.

In contrast, the defendant commissioner argues that even if a copyright does exist in this case, it is the film, that is, the finished product, which was leased and not the copyright itself. As was stated in one of the early cases involving this issue, "[t]he license to exhibit without the transfer of possession would be valueless. Together they are one transaction and constitute a sale." *United Artists Corporation* v. *Taylor*, 273 N.Y. 334, 341, 7 N.E.2d 254 (1937). See also *Boswell* v. *Paramount Television Sales, Inc.*, supra, 493; *American Television Co.* v. *Hervey*, 253 Ark. 1010, 490 S.W.2d 796 (1973); *Mt. Mansfield Television, Inc.* v. *Vermont Commissioner of Taxes*, 133 Vt. 284, 336 A.2d 193 (1975).

The plaintiffs' reliance on such cases as *Dun & Bradstreet, Inc.* v. *City of New York*, 276 N.Y. 198, 11 N.E.2d 728 (1937), to support their argument that the transfer of the film was not a transfer of tangible personal property is misplaced. In *Dun & Bradstreet, Inc.*, an information service was sold to its subscriber. Books were furnished to the subscribers with title retained by Dun & Bradstreet. No charge was made for the use of these books. In that case it was concluded that the books that were given to subscribers were only incidental to providing information and hence were not taxable. In a later case, *Moody's Investors Service* v. *Taylor*, 254 App. Div. 726, 5 N.Y.S.2d 765 (1938), it was held that if the information furnished was not confidential, so that the subscriber may assign or exhibit for his own profits the reports which he received as a service, then it apparently loses its character as essentially a service to its subscriber and becomes taxable.

In examining the character of the present agreement, although called a license, it is evident that

under it the plaintiffs' object was to acquire possession of the film in its finished state in order to reproduce it for profit rather than to acquire the services performed in producing the film. See *Federated Department Stores, Inc.* v. *Kosydar,* 45 Ohio St. 2d 1, 340 N.E.2d 840 (1976). Although, as the plaintiffs argued, the performances could have been telecast without the film or could have been performed live on stage, the fact is, that was not the case. Rather, the performances were shown on film, which is tangible personal property. The transaction was therefore a lease of tangible personal property.

The plaintiffs state that even if it is determined that there was a transfer of tangible personal property, General Statutes § 12-412 exempts the transaction from taxation. Under § 12-412 (k), the sale or lease of personal services are not taxable: "Personal Services. Professional, insurance or personal services transactions . . . which involve sales as inconsequential elements for which no separate charges are made." The plaintiffs point to the fact that the cost of producing and printing "Hard Times" was $3,500,000. Most of this was for personal services and the film print itself was worth only $595.

Since this state's sales and use tax is based substantially on the Ohio statutes, the decisions of that court have more than passing interest in the examination and applicability of our sales and tax statutes. In *Recording Devices Co.* v. *Porterfield,* 30 Ohio St. 2d 208, 213, 283 N.E.2d 626 (1972), it was held that " '[p]ersonal service' means an act done personally by a particular individual; it is, in effect, an economic service involving either the intellectual

or manual personal effort of an individual, not the saleable product of his skill." In *Columbus Coated Fabrics Division* v. *Porterfield,* 30 Ohio St. 2d 307, 309, 285 N.E.2d 50 (1972), the plaintiffs claimed that artistic designs which could be translated into wall covering designs were the product of an artist's skill and talent and that the value of the design was determined by its quality and merit and not by the inconsequential cost of the paper and paint used to convey the design. The court held that the fact that an artist's skill and professional knowledge go into the creation of a design does not mean that a subsequent sale of that design is an incident to a personal service transaction, regardless of the inconsequentiality of the tangible personal property. It held that the transaction involved the sale of an end product rather than the service rendered.

In *Accountants Computer Services, Inc.* v. *Kosydar,* 35 Ohio St. 2d 120, 298 N.E.2d 519 (1973), the test laid down for determining whether a consequential service rendered is taxable or not under the exemption (which is similar to the exemption under question here) was to examine the real object sought by the buyer, i.e., the service per se or the property produced by the service, and to determine if it was the buyer's object to obtain an act done personally by the individual as an economic service involving either the intellectual or manual effort of the individual, or if it was the buyer's object to obtain only the saleable end product of some individual's skill.

An examination of the cases on the issues raised in this action makes clear that there is a split of authority. (See *Washington Times-Herald, Inc.* v. *District of Columbia,* supra, and *Watson Industries, Inc.* v. *Shaw,* supra.) Taking into consideration

these opposing views, this court is persuaded by the reasoning in the more recent decisions which is advanced by the defendant commissioner. The test suggested by the Ohio case of *Accountants Computer Services, Inc.* v. *Kosydar,* supra, is the correct standard for determining the taxability under our tax statutes when consequential services are entwined with tangible personal property. The critical factor is whether the buyer intended to buy an individual's skills or a tangible end product of those skills.[2]

Based on the stipulated facts, it is clear that the plaintiff exhibitor's object in this case was to obtain possession of the saleable end product, the film. This is especially true in this instance where the rental fee or "license" cost is dependent on how many persons were estimated to view the film.

The rental or license to exhibit the motion picture "Hard Times" was a taxable "sale" under the Sales and Use Tax Act. Moreover, since the film is a saleable end product, the personal service exemption of General Statutes § 12-412 (k) is inapplicable.

There is error, the judgment is set aside and the case is remanded with direction to render judgment for the defendant.

In this opinion the other judges concurred.

---

[2] Using this principle, the Connecticut cases of *International Business Machines Corporation* v. *Brown,* 167 Conn. 123, 355 A.2d 236 (1974), *United Aircraft Corporation* v. *Connelly,* 145 Conn. 176, 140 A.2d 486 (1958), and *United Aircraft Corporation* v. *O'Connor,* 141 Conn. 530, 107 A.2d 398 (1954), fall into place.